[Nos. H003537, H003579, H003747. Sixth Dist. Jan. 25, 1988.]

ARTURO KLEIN et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY,
Respondent;
DIANA THOMAS et al., Real Parties in Interest.

COUNSEL

McCutchen, Doyle, Brown & Enersen, C. William Craycroft, Anne T. O'Meara, Richard B. Ulmer, John R. Reese and Paul G. Urla for Petitioners.

No appearance for Respondent.

Edmond C. Gregorian, Becky R. Hayworth, Cynthia C. Cannady, Michael D. Moradzadeh, Sally M. Abel, Fenwick, David & West and Thomas Elke for Real Parties in Interest.

OPINION

CAPACCIOLI, J.—We consolidate these related petitions for writs of mandate which raise three questions: first, should the trial court have granted defendants' motion for a stay on the ground of forum non conveniens (Code Civ. Proc., § 410.30) because of an earlier filed pending action in Switzerland; second, should defendants' motion to recuse plaintiffs' counsel have been granted because a member of that law firm formerly represented defendant Arturo Klein; third, did the trial court err in ordering lis pendens notices on defendant Arturo Klein's property reinstated as a sanction for his assertion of Fifth Amendment privilege in refusing to answer discovery questions?

We have decided, for reasons we shall state, that a stay should have been granted; that counsel should have been recused; and that the issue of the lis pendens notices should be remanded to the trial court so that it may exercise its discretion, in light of our decision to order a stay, as to what security devices, if any, should appropriately be imposed to provide plaintiffs security in the event that the trial does eventually go forward and result in a judgment.

Petitioners, defendants below, are Arturo and Rebecca Klein (husband and wife) and three corporations organized under the laws, respectively, of Panama, Switzerland, and California. (Hereafter, collectively, Arturo.) Real parties in interest, plaintiffs below, are Diana Thomas and Rolando Klein, the sister and brother of Arturo. (Hereafter, collectively, Plaintiffs.) Plaintiffs filed this civil action in Santa Clara County April 22, 1987, for fraud, breach of fiduciary duty, conversion and breach of contract. Plaintiffs and Arturo are the children of decedent Jose Klein, an international businessman who died domiciled in Geneva, Switzerland in 1977, where he had

lived since 1968. He died intestate, and pursuant to Swiss succession law, the estate passed to the three children. Diana and Rolando claim that their brother misappropriated family assets over approximately a seven-year period.

Specifically the complaint alleges after Jose's death in 1977, the children agreed Arturo would act as a fiduciary and liquidate and distribute the family assets, but instead he engaged in unauthorized and secret transactions which cheated Plaintiffs of their rightful portions.

A principal asset of the estate was shares representing 40 percent ownership of American Business Corporation (ABC), a Panamanian holding company for the Klein family interests, whose principal asset was shares in a Swiss banking concern, Sofincontal, S.A. (Sofincontal). ABC was dissolved in September 1981 as part of the liquidation of the Klein estate; Sofincontal continues in business in Switzerland, and all of its employees other than Arturo live in Switzerland or elsewhere in Europe.

None of the individual parties is an American citizen except Rolando Klein, who has lived in California since 1969. Arturo, after undertaking the liquidation of the Klein estate, moved with Rebecca to Saratoga, California where they received green cards evidencing permanent alien resident status in 1985. Diana Thomas and her husband moved to California in 1983; before that they had lived in Switzerland and in Chile.

In February 1987 before they filed this action, Plaintiffs asked criminal authorities in Switzerland to investigate their complaints against Arturo. Arturo characterizes Plaintiffs' conduct as the filing of a criminal complaint against Arturo in Geneva on February 16, 1987; but it is unclear under Swiss law whether the action was filed by the Swiss authorities in the name of Plaintiffs or whether Plaintiffs filed it, and it is likewise unclear to what extent the proceeding is civil and to what extent it is criminal. According to the expert declaration of one international lawyer (Junod), the action may be described as a Swiss criminal proceeding still in the investigative stage. A magistrate will investigate Arturo's conduct and determine whether or not an indictment will be issued. Even if it does issue, investigation will continue until the magistrate determines the case is ready for trial. It is highly unlikely the investigative phase will be completed before one to two years, and it is not highly unusual that criminal investigations in such matters can last three or four years. During that entire period, any civil action against Arturo in Switzerland based on these transactions would be stayed. At the end of such an investigation, Plaintiffs would have to institute a civil action to recover damages; however, the moving parties (Plaintiffs) have a right of participation in the criminal proceeding, in aid of the criminal prosecutor,

with limited rights to question witnesses and examine the files, and in certain limited circumstances they can ask the criminal trial court to award them damages. Normally, according to Junod, this procedure is only used where there is no further investigation needed to establish the nature and amount of the loss.

Should Plaintiffs eventually institute a civil action against Arturo in Switzerland, it would differ from a California action in many important respects. Plaintiffs would have no right to jury trial; they could not recover punitive damages; they could not conduct any discovery; they could not compel production of documents by witnesses. Junod comments that in a complex proceeding such as this where most of the relevant records are in the defendant's control, such a limitation would put Plaintiffs at an obvious disadvantage.

The Swiss action was initiated by a letter from Diana Thomas and Rolando Klein to the Attorney General of Switzerland beginning with this paragraph: "We find ourselves under the painful duty of bringing this complaint against our brother Arturo Klein, . . . for abuse of confidence, fraud, and breach of duty of loyalty." It then recites the history of the senior Klein's death and the alleged evidence of Arturo's mismanagement of the legacy and unauthorized dissolution of ABC, 40 percent of the shares of which corporation formed a principal asset of the estate. Arturo secretly and illegally dissolved ABC on September 18, 1981, withholding that information from Plaintiffs, who as shareholders were entitled to be told. Arturo misappropriated Plaintiffs' shares of ABC and of its principal asset, Sofincontal. The letter charges criminal violations of Swiss laws in the nature of embezzlement, fraud, and breach of the duty of loyalty. Pursuant to this letter of complaint, the Swiss examining magistrate has levied a search warrant against Arturo and has taken possession of and now holds all shares of Sofincontal.

The letter of complaint says each of the complainants has only received the sum of $550,000 from the estate and "[a]ll indications are that the balance, amounting to about $2,500,000 each, will not be remitted. Our brother at this very moment is directly or indirectly appropriating these sums."

Arturo has lodged a request to take judicial notice of Swiss law and Swiss decisions, including translations of Chapter 2 of the Swiss Contract Law from the Swiss Code of Obligations containing provisions analogous in many ways to California tort law. The general provision, Article 41, says whoever unlawfully causes damage to another shall be liable. Article 42 fixes the burden of proof of damages on the damaged party. Article 43

allows the judge to determine the nature and amount of compensation taking into account the circumstances and the degree of fault. Other provisions give the judge broad discretion to adjust the amount of damages, as where the consequences of the injury cannot be immediately established with certainty, or where "individual inherent rights" are injured. (Arts. 46, 49) The judge also may determine rights of contribution among joint tortfeasors (Art. 50) and may award other kinds of reparations in addition to damages. (Art. 49) There are also provisions providing for restitution of unjust enrichment, closely similar to California law. (Art. 62 et seq.)

Further, Arturo has lodged a translation of Article 7 of the Geneva Code of Criminal Procedure. That article provides that a civil action for damages caused by a crime may be brought at the same time and before the same court as the public action. If a civil action is brought separately, it will be stayed until completion of the criminal action. A civil party to a criminal proceeding in Geneva has the right to be represented by counsel, to be admitted to all hearings, and to have access to the file of the magistrate (Juge) and to ask questions of the Attorney General and the accused.

Also Arturo asks us to take judicial notice that Swiss case law holds that a plaintiff can only recover damages if he can establish a natural and direct causal relationship between the wrongful act and the damages; but the wrongful act need not be the sole or principal cause, but only a contributing cause, to authorize recovery.

Arturo argues that the allegations of the complaint in the California action and those of the Swiss complaint are identical. The three corporate defendants in the California action are not parties to the Swiss action; however, Arturo says they were sued solely as recipients of the alleged improper winding up of the Klein estate. Apparently constructive trust relief is sought against them.

Plaintiffs have submitted an opposing declaration by the Swiss attorney, Junod, asserting that in this matter civil damages will not be available in the criminal prosecution because it will be necessary to investigate further before calculating damages; as civil parties Plaintiffs can only act to assist the Attorney General and do not control the matter; and no civil action will be permitted until the criminal investigation is completed.

Arturo moved to stay the California action on the basis of Code of Civil Procedure sections 410.30 and 418.10 on the ground of a currently pending Swiss civil and criminal action instituted by Plaintiffs on the same facts and legal theory as this action. Also, he claims that having to respond to discov-

ery and testify in this action would jeopardize his Fifth Amendment self-incrimination rights by exposing him to sanctions under Swiss law.

## I. Forum Non Conveniens Motion

■ A fundamental principle of choice of forum deeply rooted in California precedent is not to disturb the California plaintiff's choice of forum except for weighty reasons. (E.g., *Corrigan* v. *Bjork Shiley Corp.* (1986) 182 Cal.App.3d 166, 173 [227 Cal.Rptr. 247].) No California appellate court to date has decided in a published opinion that a California litigant should be prevented from proceeding in California, the forum of its choosing.

On the other hand, no decision in this body of precedent presents a factual situation where, as here, the plaintiff has elected two forums, foreign and domestic. Neither the Australians who elected a California forum in *Corrigan* v. *Bjork Shiley Corp., supra,* nor the British citizens who attempted to sue here in *Holmes* v. *Syntex Laboratories, Inc.* (1984) 156 Cal.App.3d 372 [202 Cal.Rptr. 773], were attempting, like Plaintiffs here, to proceed at once in Australia or England and in California.

The 1986 amendment to Code of Civil Procedure section 410.30 states that the domicile or residence in this state of any party to the action shall not preclude the court from staying or dismissing the action. Whether that amendment will be interpreted as changing the above-cited deeply rooted policy remains to be seen, but a fair interpretation of the amendment is that the Legislature intended that future decisions assign less weight than hitherto to the factor of the plaintiff's local residence.

We do not deal here with long-standing California residents nor with persons of limited mobility for whom it is a real hardship to litigate far from home. All parties involved in this action have moved freely from country to country throughout their lifetimes. Further, their dispute involves wealth mostly generated and held outside this country, and in all probability much of the alleged malfeasance involves dealings that did not take place in California, such as the liquidation and distribution of a foreign estate. Under such circumstances, the fact that the Plaintiffs are California residents is not so significant as it might normally be.

■ Examining Arturo's specific contentions in support of his forum non conveniens claim, he says, first, all the principal party defendants are amenable to Swiss process: Arturo is already a defendant, Rebecca a potential defendant, in the Swiss action; the Swiss corporate defendant, ACIF, S.A., is located in Switzerland; the remaining corporate defendants are merely repositories of the alleged ill-gotten gains, and any judgment obtained

against the principal defendants could be enforced against these entities later. Defendant Dakari S.A. is a dissolved Panamanian corporation, and the California corporation, Body Motion, Inc. is owned wholly by Rebecca. Further, all defendants offer to submit to Swiss jurisdiction.

Regarding witness convenience, Arturo says we are talking about dissolution of a Swiss estate, which took place in Switzerland subject to Swiss law; and the principal estate asset, Sofincontal, is located in Switzerland and in fact has been seized by the Swiss court and is in its custody. In addition, the alleged unauthorized dissolution of ABC in 1981 was approved by a shareholders' meeting in Geneva in September 1981. Further, defendants say they anticipate calling European witnesses, but they do not provide specifics. Finally, Arturo points out that Plaintiffs have already given testimony before the Swiss magistrate, and are clearly prepared to participate in that action there which they themselves have instigated.

Regarding choice of law factors, Arturo says Swiss law will apply regardless of forum. The breach of contract issues revolve about an alleged oral contract concerning liquidation of the Klein estate. Although defendants deny the existence of such an agreement, they say if it existed at all it was entered into at the time of Jose Klein's death in Switzerland. The parties were all located there then. The contract made in Switzerland and to be performed there, where the estate was to be liquidated, is controlled by Swiss law. (Civ. Code, § 1646.)

The torts alleged against Arturo all involve conduct in winding up the estate. Clearly Swiss law will govern that conduct. Switzerland has a significant interest in regulating the affairs of its corporate and individual citizens and in overseeing the intestate succession of Swiss decedents. Further, from 1977 when Jose Klein died, to 1981 when the alleged unauthorized dissolution of ABC took place, no party but Rolando was a California or a United States resident; as stated, Diana lived in Switzerland until 1979 and then until 1983 in Chile. Rolando lived in California, but he has admitted the competence of Swiss courts to adjudicate this dispute, insofar as dissolution of the estate is concerned.

Trial in Switzerland results in applying law of the forum, whereas California would have to apply foreign law to much or all of the dispute. This factor militates in favor of the Swiss forum. (E.g., *Price* v. *Atchison T. & S. F. Ry. Co.* (1954) 42 Cal.2d 577, 585 [268 P.2d 457, 43 A.L.R.2d 756]; *Great Northern Ry. Co.* v. *Superior Court* (1970) 12 Cal.App.3d 105, 113 [90 Cal.Rptr. 461].)

As to enforceability of any judgment entered here, Arturo points out the Swiss court has taken jurisdiction over Sofincontal, and is therefore in the

best position to give relief to Plaintiffs who are demanding some of the shares of that entity. Also, they seek an accounting of its assets and liabilities; again, that will be difficult to manage in California. However, if a money judgment is obtained in Switzerland, full relief can be obtained here by enforcing it under the Uniform Foreign Money-Judgments Recognition Act. (Code Civ. Proc., § 1713 et seq.) Also, by staying this action the court will retain jurisdiction to enforce any later entered Swiss judgment.

Other arguments, involving language problems, bringing European witnesses to California, travel costs, and relative expense are inadequately documented in specific terms, and we do not view these factors as determinative.

However, an additional factor favoring a stay is the inefficiency of permitting parallel proceedings to go forward.

If this lawsuit is permitted to go forward here at this time it will be greatly complicated by Arturo's recurring and legitimate need to assert the Fifth Amendment privilege to protect against both civil and criminal incrimination in Switzerland.

Arturo claims potential exposure to liability in Switzerland based on two related rationales. First, he contends Swiss law (Art. 47 of the Swiss federal law on banking of Nov. 8, 1934) makes it a crime for an employee or former employee to disclose banking secrets, even negligently. Sofincontal was a Swiss banking concern; and Plaintiffs seek an accounting of that entity, records of its receipts and disbursements, and related information. To allow this action to go forward, Arturo says, would expose him to the risk of a second criminal prosecution in Switzerland for violating Article 47. He also says there is no statute of limitations on Article 47 and it does not matter that Sofincontal after 1978 was no longer a banking corporation. Plaintiffs' expert on Swiss law rejects this argument, contending Article 47 is not a defense to accusations against a bank officer of misconduct, and therefore it is absurd for Arturo to say he could refuse to disclose his own dealings with the family assets on the basis of Article 47. But clearly this statement does not address the self-incrimination aspect of the problem. We cannot resolve the question, to be decided under Swiss law, whether Arturo has a duty to disclose alleged malfeasance regardless of the incriminatory aspects of such disclosures; but it is at least arguable that under California and federal law in this country, he may indeed have a privilege not to be compelled to disclose matter which may expose him to the risk of a second criminal Swiss prosecution for violating bank secrets law. Plaintiffs' expert does not say there is no such risk. He says only that Arturo could not, on the ground of privilege, avoid such disclosures under Swiss law.

Second, Arturo points out that he is a party defendant to Swiss criminal proceedings involving the same conduct charged as tortious here, and he will be impeded from testifying in his own defense because he will have to invoke the privilege here. He says at a minimum he is entitled to a stay of discovery until disposition of the criminal matter or until expiration of the criminal statute of limitations. He cites *Pacers, Inc.* v. *Superior Court* (1984) 162 Cal.App.3d 686 [208 Cal.Rptr. 743], a decision holding where defendants in a civil lawsuit face a real threat of criminal prosecution, so that they may invoke the privilege during discovery, they may not be penalized for exercising that constitutional privilege by being forced to stand mute through the lawsuit; rather, it is appropriate to stay discovery until expiration of the relevant criminal limitations period. The stay in *Pacers* was from December 1984 to January 1986, about one year. The threat of criminal prosecution there was that the United States attorney had unsuccessfully sought indictments against petitioners, but still had an open file on the case, involving acts of assault and battery also charged in the civil action. It was conceded in *Pacers* that defendants had a Fifth Amendment privilege not to respond to the discovery questions involved; but the trial court had ruled that the trial would proceed and defendants would not be allowed to testify.

A first impression issue in this state is whether the privilege is available to prevent incrimination under the law of a foreign jurisdiction. The federal decisions conflict on this issue. No United States Supreme Court decision squarely holds either way, although language has been cited from *Murphy* v. *Waterfront Comm'n.* (1964) 378 U.S. 52, 67 [12 L.Ed.2d 678, 688, 84 S.Ct. 1594], noting in dictum that where there is real danger of prosecution in a foreign country, the case does not differ in principle from one involving danger of prosecution under local law. (In *Murphy,* however, the actual holding was that the Fifth Amendment could be invoked in a state proceeding when the danger was of prosecution under federal law.)

A recent appellate federal decision notes the conflict among the cases and holds the privilege is unavailable to protect from foreign incrimination unless the foreign sovereign and the sovereign using the testimony both are restrained from compelling self-incrimination. (*United States* v. *(Under Seal)* (4th Cir. 1986) 794 F.2d 920, 926.) Petitioner has offered a translation of Article 48 of the Geneva Code of Criminal Procedure which offers protection similar to the Fifth Amendment to the United States Constitution, saying a witness may "refuse to give information which exposes him personally or other parties indicated in Article 45 to criminal proceedings or which leads to serious dishonor." Accordingly, for purposes of the *Under Seal* case the requirement that the foreign sovereign offer the privilege seems to be satisfied.

Cases permitting invocation of the privilege to prevent foreign incrimination include *Mishima* v. *United States* (D. Alaska 1981) 507 F.Supp. 131, 135; *In re Mid-Atlantic Toyota Antitrust Litigation* (D.Md. 1981) 92 F.R.D. 358, 359.

Discovery is now proceeding in this matter and difficulties have already developed. Arturo invoked his privilege in depositions, and the superior court ruled the privilege was properly invoked and applicable, but ordered sanctions against Arturo in the form of restoring previously expunged lis pendens notices against his real property. (This ruling is the subject of a related petition, discussed at III, *infra*.) Thus his need to protect himself against liability in the Swiss proceeding interferes with his ability effectively to protect his interests here. That is an unfair result which argues against allowing both proceedings to go forward.

We agree with Arturo that it is unconscionable to force defendants to defend themselves simultaneously in two or more actions on two continents in two languages and under two different legal systems. Also, it is an imposition upon the California court to try an action which will be plagued with difficulties involving petitioners' invocation of Fifth Amendment privileges and related problems and which will require the application of foreign law. Although it is true that the California forum presents strategic advantages for Plaintiffs, that fact should not determine the matter, for if it did, many causes of action closely connected with foreign forums would be brought in the more attractive American courts, flooding our system and taxing our resources with matters having little reasonable connection with this jurisdiction. (See, e.g., *Piper Aircraft Co.* v. *Reyno* (1981) 454 U.S. 235 [70 L.Ed.2d 419, 102 S.Ct. 252]; 2 Witkin, Cal. Procedure (3d ed. 1985) Jurisdiction, § 305 at p. 714 et seq.) When, as here, a matter is most closely connected with a foreign jurisdiction, there is no inequity in requiring that it be pursued there if at all possible. Here, it is not only possible, but the foreign forum was chosen by Plaintiffs first.

In light of our determination that a writ of mandate should issue compelling a stay in favor of the Swiss proceeding, we do not need to discuss Arturo's contentions that he is entitled to a stay on Fifth Amendment grounds, except to note there is no precedent supporting a blanket stay under such circumstances. (See. e.g., *Warford* v. *Medeiros* (1984) 160 Cal.App.3d 1035, 1044-1045 [207 Cal.Rptr. 94].)

## II.  RECUSAL OF TRIAL COUNSEL

In a separate petition for writ of mandate, Arturo moves to disqualify Plaintiffs' law firm, Fenwick, Davis & West, because a partner, Norman

Glickman, was formerly a member of another law firm, Fuller, Glickman, Mousalam & Barton, which allegedly over a three-year period rendered legal services on numerous matters to Arturo including financial dealings involved in this lawsuit.

The trial court partly granted relief by disqualifying Glickman personally, but not the entire firm. The trial court also decreed a Chinese wall, forbidding Glickman from taking any part in this action or communicating any information about his prior dealings with Arturo to the Plaintiffs here.

However, Arturo says it is too late to build such a wall; the entire Fenwick firm is infected with Glickman's intimate knowledge of Arturo's financial affairs which are in issue here. He points out Glickman's is one of two names actually on the complaint, and also alleges (although he cannot personally know this) that the Plaintiffs picked the Fenwick firm precisely to exploit Glickman's familiarity with Klein dealings and affairs.

The parties' declarations disagree as to whether Glickman represented Arturo in matters significantly involved in this lawsuit. Glickman is an estates and trusts specialist and did that kind of work in the Fuller firm (and similarly does that kind of work now, not litigation, in the Fenwick firm, yet his name is on the complaint). According to his declaration, he practiced with the Fuller firm from 1978 until July 31, 1982. He first met with Arturo in July 1979 who requested advice regarding United States tax treatment of real property held by aliens, and advice on immigration matters. Glickman had no substantial expertise in those areas and referred Arturo to his partner Dale Fuller, who, assisted by two associates, Mather and Ames, did some tax planning and immigration counselling for Arturo. Glickman denies significant participation in any of these matters. He denies supervising Ames and Mather in their work for Arturo, pointing out that although Arturo declares he did so, Arturo is not in a position to know that. Glickman did suggest from time to time that Arturo retain the Fuller firm for estate-planning services, in which Glickman would have actively participated, but he never did so. Glickman claims Arturo's declarations that Glickman personally handled financial ramifications resulting from Arturo's father's death, probate matters, and the like, and received confidential information relating to Arturo's personal and family finances, are all misstatements of fact.

Finally, Glickman says when he joined the Fenwick firm in July 1982 he did not take with him any of the files or documents relating to that firm's representation of Arturo. He has no such files in his possession. According to Dale Fuller, those files were retained by other Fuller firm attorneys when that firm was dissolved in 1982.

Glickman says his name appears on both the complaint and the lis pendens papers for convenience, because the only trial attorney working on the matter might be unavailable to sign papers from time to time, and because Glickman knows both Anthony and Diana Thomas and has done other legal work for them. However, Glickman claims not to have participated in drafting the lis pendens or in the subsequent conduct of this litigation, except to prepare declarations regarding the alleged conflict.

Fuller's declaration says his firm's representation of Arturo fell into two categories, real estate related tax advice and immigration work. Glickman was not involved other than making the initial introduction and occasionally appearing briefly at client meetings. Three of the four Klein files are in Fuller's possession; the contents do not reflect any involvement by Glickman. The fourth file related to visa and immigration matters, was handled by Ames, and cannot now be located.

Further, his recollection is that the tax work performed for Arturo was general, an outline of his options, rather being based on the existence of specific transactions. No probate or estate or inheritance tax work was done. The declaration of associate Mather from the Fuller firm confirms this declaration, saying she did the tax work for Arturo and it consisted mainly of schematic presentation of available tax options. Also she helped incorporate two Netherlands Antilles subsidiary corporations to be used for real estate development, ARBEC N.V. and ACIF N.V., but it is her understanding that neither of these corporations ever became active. She was named managing director of ACIF N.V., allegedly a common pro forma practice using the attorney's name for convenience. She has no familiarity with any subsequent activities of the entity and to the best of her knowledge it never became active.

Arturo's supplemental declaration contradicts these assertions and says ACIF is an active corporation that has conducted business and filed tax returns. Also he claims to have had lengthy discussions with Glickman concerning his family businesses and his father's death, and Glickman recommended he form a Swiss corporation through which to do business, which he did, forming ACIF, S.A., a defendant in this action. Arturo says he sent Glickman a memorandum regarding ACIF.

Opposing disqualification of the Fenwick firm, Plaintiffs contend the motion to disqualify is taken solely for tactical purposes and to delay the lawsuit. They say the matters handled by the Fuller firm—a construction dispute, an immigration matter, and hypothetical tax advice—have no relationship to the issues in the present case. Further, Glickman's involvement in those matters and in this litigation is peripheral. The present suit con-

cerns self-dealing and misappropriation of assets from ABC and Sofincontal, neither of which is involved in any way in the work the Fuller firm did for Arturo. The only remotely arguable related work would be the tax work, and here, Plaintiffs say, the declarations show that work was purely hypothetical advice, outlining various options on stated facts, so that it is proper to assume the extent of confidential information probably exchanged to be quite limited. (Citing *Laker Airways, Ltd.* v. *Pan American World Airways* (D.D.C. 1984) 103 F.R.D. 22, 39.) Further, the corporations formed at the Fuller firm, ARBEC, N.V. and ACIF, N.V. have nothing to do with the present defendant, ACIF, S.A. and the Fuller firm had no involvement with their activities, if any. Further, the Fuller firm, contrary to Arturo's declaration, handled no probate matters for him. They point out Arturo's assertion is that the Fuller firm handled "financial ramifications" of his inheritance, not really a declaration that firm did the probate, and in fact they did not.

They state unequivocally that the key entities here are ABC, Sofincontal, and one Continental Mining Corporation, and none of these entities is shown on any Fuller firm billings and no legal work was performed involving any of them.

Further, responding to Arturo's contention Glickman knew of his investment in certain Saratoga real estate involved in a related lis pendens dispute, Plaintiffs point out that ownership of that property is not confidential information but a matter of public record.

The decision of this court in *Maruman Integrated Circuits, Inc.* v. *Consortium Co.* (1985) 166 Cal.App.3d 443 [212 Cal.Rptr. 497], did not involve the issue of vicarious disqualification. However, that decision, affirming denial of a recusal motion, stated basic ground rules for our approach to these problems. ■ Absent an abuse of discretion, the trial court's decision is entitled to deference. The judge may consider the possibility the party brought the recusal motion as a tactical device to delay litigation. Judicial scrutiny is necessary to prevent technicalities from overcoming substantial justice. (*Id.* at pp. 450-451, citing *William H. Raley Co.* v. *Superior Court* (1983) 149 Cal.App.3d 1042 [197 Cal.Rptr. 232] [hereafter *Raley*]; *People* v. *Superior Court (Greer)* (1977) 19 Cal.3d 255 [137 Cal.Rptr. 476, 561 P.2d 1164]; *Comden* v. *Superior Court* (1978) 20 Cal.3d 906 [145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R.4th 562].)

■ In the petition for mandate here, Arturo relies on an asserted rule of automatic vicarious disqualification allegedly embodied in American Bar Association Model Code of Professional Responsibility DR 5-105(D), providing that if a lawyer must withdraw from employment, no partner or

associate or affiliated lawyer may accept or continue such employment. (Citing the leading decision in *Trone* v. *Smith* (9th Cir. 1980) 621 F.2d 994, 999.) He says since the trial court has disqualified Glickman, the entire firm must automatically be disqualified.

However, although generally the asserted proposition is true, exceptions exist where an entire law firm has not been disqualified despite disqualification of one member. One such exception, for a former government attorney, was articulated in *Chambers* v. *Superior Court* (1981) 121 Cal.App.3d 893 [175 Cal.Rptr. 575]. Discussing the general concept of vicarious disqualification which has been explored in many federal cases (such as *Trone, supra*), the decision concludes that the American Bar Association rules do not absolutely require vicarious disqualification in all cases: "DR 9-101 (B)'s command of refusal of employment by an individual lawyer does not necessarily activate DR 5-105 (D)'s extension of that disqualification." (*Id*. at p. 899.) Noting the particular hardship to public lawyers if such an automatic rule existed (making them virtual Typhoid Marys, reduced to isolated solo practice, as noted in *Kesselhaut* v. *United States* (Ct.Cl. 1977) 555 F.2d 791), the court said disqualifying the individual lawyer and screening him from the firm can suffice, in a proper case. The test is whether the individual attorney had any responsibility over matters related to the instant action or had acquired confidential information regarding the action and whether the firm had taken sufficient protective measures to screen the attorney from participation.

Arturo relies heavily on the *Raley* decision, *supra,* which makes two important points. One is that in California mere appearance of impropriety is not normally sufficient to compel disqualification; an actual or potential present conflict must be presented. (149 Cal.App.3d at p. 1047, fn. 2.) Second, that case mandates a weighing approach to the problem, balancing the competing interests: a party's right to counsel of his choice, an attorney's interest in representing a client, the financial burden of replacing disqualified counsel, possible tactical abuse and the possible disruptive effect of repeated disqualification proceedings on the administrative process of the court. (*Id*. at p. 1048.) *Raley* did mandate disqualification of a very large law firm (Gray, Cary, Ames & Fry, with 100 lawyers), but the showing was of an actual present conflict of interests because one of its attorneys, Mr. ZoBell, was presently involved with the financial affairs of Raley, while the firm represented another party (Carroll) with adverse interests. Under that showing, *Raley* said the Chinese wall solution would be inadequate. (The author of the leading article on the Chinese wall defense to disqualification agrees that isolation or screening is generally inadequate where the case involves current conflicting roles, rather than successive conflicting representations. (See Comment, *The Chinese Wall Defense to Law-Firm Disqua-*

*lification* (1980) 128 U.Pa.L.Rev. 677 at pp. 684-685.) *Raley* is not authority for the proposition that screening may never suffice to prevent vicarious disqualification; and *Chambers* is authority for the opposite rule. (*William H. Raley Co.* v. *Superior Court, supra,* 149 Cal.App.3d 1042; *Chambers* v. *Superior Court, supra,* 121 Cal.App.3d 893.)

*Global Van Lines, Inc.* v. *Superior Court* (1983) 144 Cal.App.3d 483, 489 [192 Cal.Rptr. 609], says disqualification is required when a substantial relationship exists between the former and current representation, and when it appears by virtue of the nature of the former representation or the former relationship that confidential information material to the current dispute would normally have been imparted to the attorney. Basically, that standard for disqualification of an individual attorney has existed for more than 30 years. (See Comment, *supra,* 128 U.Pa.L.Rev. at p. 681, citing *T. C. & Theatre Corp.* v. *Warner Bros. Pictures* (S.D.N.Y. 1953) 113 F.Supp. 265, 268.) If such a showing had been made here, disqualification of the Fenwick firm would be required because there was no effort to screen Glickman before the trial court made its order.

The record here does not compel a finding of a substantial relationship. The declarations conflict. However, the trial court has necessarily decided that such a relationship has not been demonstrated, because it has refused to disqualify the law firm. There is a logical inconsistency in the trial court's ruling which has disqualified Glickman, but not the entire firm, although no screening measures had been taken up to the time of the order (unlike *Chambers, supra,* where the attorney was screened from any contact with the lawsuit from day one). A possible inference, belabored by Arturo, is obviously that Glickman was disqualified because he had confidential knowledge or the opportunity to acquire it, and in turn he had the opportunity to infect the rest of the Fenwick firm with that knowledge before he was disqualified.

Plaintiffs cite one case suggesting the more peripheral and attenuated the role of the lawyer in the prior representation, the less requirement his knowledge be imputed to the entire law firm. (*Panduit Corp.* v. *All States Plastic Mfg. Co.* (Fed.Cir. 1984) 744 F.2d 1564, 1578, disapproved on another point in *Richardson-Merrell Inc.* v. *Koller* (1985) 472 U.S. 424 [86 L.Ed.2d 340, 105 S.Ct. 2757], noting, among other things, that the absence of screening is not necessarily fatal.) *Panduit Corp.,* applying Seventh Circuit law, does state the proposition that disqualification of an individual lawyer does not automatically mandate disqualification of his law firm, but in that case the reviewing court clearly disagreed with the trial court's finding that the individual lawyer should have been disqualified; however, on appeal the parties apparently agreed to a disposition allowing disqua-

lification of the attorney and ordering him to be isolated from the litigation from that point forward, but allowing the firm to continue its representation. (*Id.* at p. 1581.)

*Panduit Corp.* is distinguishable from our case because the taint was further removed. The attorney held to be disqualified had not himself personally had access to confidential information about the former client, but merely was disqualified because his law firm had represented the client and there was a possibility, undemonstrated, that he might have received such information. The issue was when this attorney joined a second firm, should his hypothetical confidential information be imputed to that second firm so as to mandate disqualification of the entire firm? In such a multiple presumption state of facts, the court found imputing the taint to the second law firm wholly unjustified, even though no effort had been made from the beginning to screen the attorney from the lawsuit. The evidence before the trial court did not demonstrate that the client's confidences had been passed on or were likely to have been passed on to members of the second firm.

Here, however, Glickman himself is the attorney who participated, allegedly, in representing Arturo. Therefore one less imputation is needed; the issue is only whether Glickman may have passed confidential information to members of his new firm, the Fenwick firm, not whether, as in *Panduit Corp.*, Glickman may have passed to firm two a hypothetical infection caught from other attorneys at firm one.

Very few California cases have allowed a law firm to continue representing a client when a member has been disqualified. As stated, *Raley, supra,* declined that option although endorsing in principle the idea that vicarious disqualification should not occur automatically but rather should only be the result of a weighing and balancing of relevant factors including the likelihood of actual conflict or imparting of confidences, the hardship in loss of the law firm's representation, the stage of the legal proceedings at which the motion for recusal was made, and other related factors. *Raley* emphasized there had been no showing that the law firm was uniquely suited to representing the client nor that other counsel was unavailable. (149 Cal.App.3d at pp. 1049-1050.) The decision emphasized that the general rule under the American Bar Association Model Code of Professional Responsibility in vicarious disqualification: "[i]f a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment." (ABA Model Code Prof. Responsibility, DR 5-105(D), cited in *Raley, supra,* at pp. 1048-1049.) Nevertheless the decision does say that automatic disqualification can be harsh and unfair, citing three decisions upon which Plaintiffs seek to rely: *Cham-*

*bers, supra,* 121 Cal.App.3d 893; *Chronometrics, Inc. v. Sysgen, Inc.* (1980) 110 Cal.App.3d 597 [168 Cal.Rptr. 196]; and *Vivitar Corp. v. Broidy* (1983) 143 Cal.App.3d 878 [192 Cal.Rptr. 281].

*Chambers,* as stated, involved the particular facts of a former government attorney who had not been substantially involved with matters related to the instant litigation and who had been screened from the litigation from the beginning. *Vivitar Corp.* is not a vicarious disqualification case. The decision in *Chronometrics* involved an attorney who was disqualified for his improper conduct in contacting a represented client personally; the court articulated as a narrow exception to the vicarious disqualification rule that in such a situation it was unnecessarily punitive to disqualify the entire law firm. Further, the individual who had been contacted by the disqualified attorney was no longer a party to the lawsuit at the time of the recusal motion, and the court expressly reserved any opinion as to the result if that fact were not so. *Chronometrics* has been followed by one decision similarly holding, when an attorney has improperly communicated with a party, it is unfair to disqualify the entire law firm, but instead the court should take all the circumstances into account, balancing them to reach a just result. (*Mills Land & Water Co. v. Golden West Refining Co.* (1986) 186 Cal.App.3d 116, 136 [230 Cal.Rptr. 461].)

The decision in *Dill v. Superior Court* (1984) 158 Cal.App.3d 301 [205 Cal.Rptr. 671], rejected the *Chambers* approach as not applicable when the attorney in question performed work for the opposing party in the same lawsuit. Those facts mandate vicarious disqualification.

The decision in *Global Van Lines, supra,* does not discuss vicarious disqualification, but proceeds on an apparent assumption that disqualification of the attorney justified disqualification of the firm, once the threshold showing was made of substantial relationship between the former and the present representation. The *Dill* decision observes that in *Global Van Lines* the court noted plaintiff did not challenge the assertion that disqualification of counsel would require disqualification of the entire firm. (*Dill, supra,* 158 Cal.App.3d at p. 305, citing *Global Van Lines, supra,* 144 Cal.App.3d at p. 485, fn. 1.)

Clearly, the California precedent has not rushed to accept the concept of disqualifying the attorney but not the firm, nor has it enthusiastically embarked upon erecting Chinese walls. Aside from two limited exceptions— the former government attorney (*Chambers*) and the punitive disqualification, not for conflict of interest but for improper communication (*Chronometrics* and *Mills*)—no California case appears to have permitted

disqualification of the individual attorney for a conflict without disqualifying his law firm.

The federal precedent has been somewhat more willing to take testimony and examine the evidentiary justification for recusing the entire firm. (See *Panduit Corp., supra,* 744 F.2d 1564, 1578; and the Second Circuit decisions in *Bd. of Ed. of N. Y. City* v. *Nyquist* (1979) 590 F.2d 1241 [mere appearance of possible impropriety too slender a reed on which to rest disqualification]; *Kesselhaut* v. *United States, supra,* 555 F.2d 791 [former government attorney].) As noted in *Chambers, supra,* the decisions express reluctance to disqualify a firm when the appearance of impropriety, rather than actual conflict, is in issue. (See *Chambers, supra,* 121 Cal.App.3d 893, 901.) The *Chambers* opinion also quotes from the Pennsylvania law review comment, *supra,* entitled *The Chinese Wall Defense to Law-Firm Disqualification,* which also cautions that disqualification is an excessive sanction for a concededly nonexistent impropriety, particularly in situations of former government attorneys. (See *Chambers, supra,* 121 Cal.App.3d at p. 902.)

Nevertheless California decisions remain concerned with the possibility of the breach of confidence which alone triggers disqualification when a sufficiently close relationship has been demonstrated between present and former representation. (See *Woods* v. *Superior Court* (1983) 149 Cal.App.3d 931, 934 [197 Cal.Rptr. 185]; *Trone* v. *Smith, supra,* 621 F.2d 994, 998-999.)

It is our opinion that in this case, unless we were prepared to reverse the trial court decision to disqualify Glickman, we could not, consistent with the precedent, permit the Fenwick firm to continue to represent Plaintiffs.

Nor can we legitimately reverse the trial court's decision to disqualify Glickman. That decision rests on a resolution of conflicting declarations. The trial court chose to accept Arturo's declaration, from which disclosure to Glickman of confidential information possibly relevant to this lawsuit may be inferred. Since there is substantial evidence in the record to support the trial court's ruling in this respect, we are bound to accept it.

Accordingly, because Glickman has been disqualified, the Fenwick firm in which he is a partner must similarly be disqualified from further representing Plaintiffs in this matter. We are compelled to this result reluctantly, fully aware that frequently recusal motions of this nature are made for tactical purposes and not based on genuine conflicts of interest. Nevertheless, California law clearly prohibits continued representation in a situation such as this, where a partner in a law firm has been disqualified from

representation because of his prior receipt of confidential information, and where there has been no attempt to screen him from the litigation at hand.

We note that the hardship occasioned by our decision to recuse counsel is somewhat mitigated by the stay of proceedings, which provides additional time for Plaintiffs to obtain substitute counsel.

### III. LIS PENDENS PETITION

In a separate petition for writ of mandate, Arturo seeks review of a trial court order reinstating previously expunged notices of lis pendens upon Arturo's California real estate under circumstances to be explained. The petition is substantially equivalent to one for statutory mandate pursuant to Code of Civil Procedure section 409.4 because the order reviewed is effectively an order refusing to expunge a lis pendens.

Plaintiffs initially filed notices of lis pendens against three parcels of Arturo's California real estate. The trial court ordered the notices expunged. Plaintiffs contend the expungement was granted because Plaintiffs had not established a prima facie case tracing Arturo's alleged ill-gotten gains into the real estate, which showing would form the only possible basis for the constructive trust or equitable lien claim asserted against the real estate. (*Coppinger* v. *Superior Court* (1982) 134 Cal.App.3d 883 [185 Cal.Rptr. 24].) Plaintiffs then pursued discovery against Arturo to obtain evidence tracing the allegedly misappropriated funds into the California real estate. Arturo asserted his Fifth Amendment privilege in refusing to answer questions about his receipt or disposition of Sofincontal funds or assets. For example he would not say whether he had commingled Sofincontal funds with his other assets.

Plaintiffs moved for reinstatement of the lis pendens notices as well as to compel discovery. The trial court ruled that Arturo had properly invoked the Fifth Amendment privilege in refusing to answer discovery questions, but that Plaintiffs were entitled to reinstate the lis pendens notices, because Arturo's assertion of the privilege prevented Plaintiffs from establishing the prima facie case which would otherwise be necessary to justify the lis pendens notices in this case. In reinstating the lis pendens notices, the judge said that the reimposition of lis pendens was "by way of imposition of the appropriate sanctions" as authorized in *Alvarez* v. *Sanchez* (1984) 158 Cal.App.3d 709 [204 Cal.Rptr. 864].

Arturo makes a number of challenges to Plaintiffs' right to maintain these lis pendens notices. Among others, he contends (1) sanctions for asserting the Fifth Amendment privilege are inappropriate at the discovery stage of

litigation (citing *Shepherd* v. *Superior Court* (1976) 17 Cal.3d 107, 117 [130 Cal.Rptr. 257, 550 P.2d 161]); (2) a stay of the trial would be more appropriate than imposing sanctions, since such a stay would obviate the need to assert the privilege (citing *Pacers, Inc.* v. *Superior Court, supra,* 162 Cal.App.3d 686, 689); (3) the sanctions are unrelated to the conduct in asserting the privilege and therefore unwarranted; (4) the sanctions were imposed in violation of Arturo's procedural due process rights because Plaintiffs requested sanctions only for improper invocation of the privilege, but sanctions were imposed on a different ground, fairness to Plaintiffs; (5) notices of lis pendens are in any event not warranted in this case because the lawsuit is not a claim to specific real property but rather seeks to use the lis pendens device to gain security against the eventual judgment, in the nature of a prejudgment attachment device, but without the restrictions and safeguards surrounding that remedy. (See, e.g., discussion in *Burger* v. *Superior Court* (1984) 151 Cal.App.3d 1013, 1018 [199 Cal.Rptr. 227].)

Although many decisions agree that some juristic consequences may appropriately be imposed upon parties asserting the Fifth Amendment privilege, the decisions furnish little guidance as to what consequences are specifically available. (See, e.g., *Alvarez* v. *Sanchez, supra,* 158 Cal.App.3d 709 and authorities there discussed at p. 713, text and fn. 3; see also such federal decisions as *Beilan* v. *Board of Education* (1958) 357 U.S. 399, 409 [2 L.Ed.2d 1414, 1421-1422, 78 S.Ct. 1317]; *Nelson* v. *Los Angeles County* (1960) 362 U.S. 1, 7 [4 L.Ed.2d 494, 499, 80 S.Ct. 527]; *Orloff* v. *Willoughby* (1953) 345 U.S. 83 [97 L.Ed. 842, 73 S.Ct. 534]; *Baxter* v. *Palmigiano* (1976) 425 U.S. 308, 318 [47 L.Ed.2d 810, 821, 96 S.Ct. 1551].) Here, however, in light of our decision to stay the proceedings, it is not necessary to resolve the difficult issue whether imposition of a lis pendens against property is an appropriate consequence in a lawsuit where the property owner's assertion of the privilege prevents Plaintiffs from showing their entitlement to the lis pendens. Imposition of the stay of proceedings makes it unnecessary for any discovery to go forward impinging upon Arturo's self-incrimination rights. Therefore, the issue is more appropriately whether as a condition of the stay, the trial court should provide Plaintiffs some security, in the form of lis pendens notices or otherwise, against an eventual judgment. Although no such remedy appears to be statutorily available other than the lis pendens (or a bond in lieu of lis pendens under Code Civ. Proc., § 409.2), we think the trial court's inherent powers clearly include the right to condition a stay of trial upon such terms as may be just.

Accordingly we shall vacate the trial court order reinstating the notices of lis pendens and shall remand this issue to the trial court for reconsideration in light of our decision to issue a stay. The court may consider such security devices as justice warrants, including but not limited to the posting

of a bond under Code of Civil Procedure section 409.2; the deposit of any proceeds from sale of the real estate in a blocked account while the stay is in effect; or such other devices as may best serve the purpose of protecting Plaintiffs' rights without unnecessarily encumbering the sale of real property.

## IV. DISPOSITION

Real parties in interest have been notified that a peremptory writ in the first instance could be issued here, and they have filed opposition. The peremptory writ of mandate will issue in the first instance. (Code Civ. Proc., § 1088; *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 177-182 [203 Cal.Rptr. 626, 681 P.2d 893].)

Let a peremptory writ of mandate issue as prayed directing the respondent court to (1) vacate its order denying a stay pursuant to Code of Civil Procedure section 410.30 and instead make an order staying this action until completion of the proceedings in Switzerland; (2) vacate its order denying recusal of Plaintiffs' counsel and instead enter a different order compelling recusal of the law firm of Fenwick, Davis & West from further representation of Plaintiffs herein; (3) vacate its order permitting reimposition of lis pendens notices and instead reconsider the matter in light of the principles expressed in this opinion. Petitioners shall have costs as the prevailing parties in these proceedings. Our temporary stay of proceedings shall remain in effect until this opinion becomes final; however, neither our temporary stay, nor the stay which we have ordered pursuant to Code of Civil Procedure section 410.30, shall be deemed to prevent the trial court from granting to Plaintiffs such prejudgment security remedies as in the court's discretion shall appear appropriate to preserve the status quo while either stay is in effect.

Brauer, Acting P. J., and Stone, J.,* concurred.

The petition of real parties in interest for review by the Supreme Court was denied April 6, 1988.

---

* Assigned by the Chairperson of the Judicial Council.