[No. A047921. First Dist., Div. Three. July 19, 1991.]

In re COMPLEX ASBESTOS LITIGATION.
FLOYD W. WIDGER et al., Plaintiffs and Appellants, v.
OWENS-CORNING FIBERGLAS CORPORATION et al., Defendants and
Appellants;
GAF CORPORATION et al., Defendants and Respondents;
JEFFREY B. HARRISON et al., Objectors and Appellants.
[And eight other cases.]*

---

*Clayton v. Owens-Corning Fiberglas Corporation (S.F. Super. Ct. No. 895216); Maslowski v. Owens-Corning Fiberglas Corporation (S.F. Super. Ct. No. 897343); Box v. Owens-Corning Fiberglas Corporation (S.F. Super. Ct. No. 897344); McFarland v. Owens-Corning Fiberglas Corporation (S.F. Super. Ct. No. 897346); Dennis v. Owens-Corning Fiberglas Corporation (S.F. Super. Ct. No. 897347); Romo v. Owens-Corning Fiberglas Corporation (S.F. Super. Ct. No. 897533); Favalora v. Owens-Corning Fiberglas Corporation (S.F. Super. Ct. No. 898524); Crain v. Owens-Corning Fiberglas Corporation (S.F. Super. Ct. No. 898525).

COUNSEL

Bryce C. Anderson for Plaintiffs and Appellants and for Objectors and Appellants.

Morgenstein & Jubelirer, Eliot S. Jubelirer and Larry C. Lowe for Defendants and Appellants.

No appearance for Defendants and Respondents.

OPINION

CHIN, J.—Attorney Jeffrey B. Harrison, his law firm, and their affected clients appeal from an order disqualifying the Harrison firm in nine asbestos-related personal injury actions.[1] The appeal presents the difficult issue of whether a law firm should be disqualified because an employee of the firm possessed attorney-client confidences from previous employment by opposing counsel in pending litigation. We hold that disqualification is appropriate unless there is written consent or the law firm has effectively screened the employee from involvement with the litigation to which the information relates.

---

[1]The order disqualified the law firm of Jeffrey B. Harrison, including the attorneys employed by the firm and the firm's nonattorney staff members, as well as the joint venturers in the firm's asbestos practice, Attorneys George Corey and Robert Glynn. In this opinion, we will refer to these appellants collectively as the Harrison firm. The employee involved, Michael Vogel, has not appealed from the trial court's order, which placed certain restrictions on him.

Respondents[2] cross-appeal from the trial court's order, contending that the Harrison firm should have been disqualified in all asbestos cases throughout the state. We hold that a trial court does not have authority to disqualify counsel in proceedings pending in other courts. Further, the trial court did not abuse its discretion by not disqualifying the Harrison firm in all asbestos cases before the court. Therefore, we affirm the order of the trial court.

## FACTS

Michael Vogel worked as a paralegal for the law firm of Brobeck, Phleger & Harrison (Brobeck) from October 28, 1985, to November 30, 1988. Vogel came to Brobeck with experience working for a law firm that represented defendants in asbestos litigation.[3] Brobeck also represented asbestos litigation defendants, including respondents. At Brobeck, Vogel worked exclusively on asbestos litigation.

During most of the period Brobeck employed Vogel, he worked on settlement evaluations. He extracted information from medical reports, discovery responses, and plaintiffs' depositions for entry on "Settlement Evaluation and Authority Request" (SEAR) forms. The SEAR forms were brief summaries of the information and issues used by the defense attorneys and their clients to evaluate each plaintiff's case. The SEAR forms were sent to the clients.

Vogel attended many defense attorney meetings where the attorneys discussed the strengths and weaknesses of cases to reach consensus settlement recommendations for each case. The SEAR forms were the primary informational materials the attorneys used at the meetings. Vogel's responsibility at these meetings was to record the amounts agreed on for settlement recommendations to the clients. Vogel sent the settlement authority requests and SEAR forms to the clients. He also attended meetings and telephone conferences where attorneys discussed the recommendations with clients and settlement authority was granted. Vogel recorded on the SEAR forms the

---

[2]The respondents who appealed from the judgment are ACandS, Inc., Celotex Corporation, Eagle-Picher Industries, Inc., Fibreboard Corporation, Owens-Corning Fiberglas Corporation, Owens-Illinois, Inc., and Pittsburgh Corning Corporation. These parties will be referred to collectively as respondents in this opinion. Additional respondents who did not appeal are A.P. Green Industries, Inc.; Armstrong World Industries, Inc.; Carey Canada, Inc.; Certainteed Corporation; Flexitallic Gasket Company, Inc.; Flintkote Company; GAF Corporation; Keene Corporation; National Gypsum Company; Plant Insulation Company; Turner & Newall, P.L.C.; and United States Gypsum Company.

[3]In this opinion we use the term "asbestos litigation" to refer to civil actions for personal injury and wrongful death, allegedly caused by exposure to asbestos products, brought against manufacturers, distributors, and sellers of such products.

amount of settlement authority granted and distributed the information to the defense attorneys.

The SEAR form information was included in Brobeck's computer record on each asbestos case. The SEAR forms contained the plaintiff's name and family information, capsule summaries of medical reports, the plaintiff's work history, asbestos products identified at the plaintiff's work sites, and any special considerations that might affect the jury's response to the plaintiff's case. The SEAR forms also contained information about any prior settlements and settlement authorizations. Information was added to the forms as it was developed during the course of a case. Vogel, like other Brobeck staff working on asbestos cases, had a computer password that allowed access to the information on any asbestos case in Brobeck's computer system.

Vogel also monitored trial events, received daily reports from the attorneys in trial, and relayed trial reports to the clients. Vogel reviewed plaintiffs' interrogatory answers to get SEAR form data and to assess whether the answers were adequate or further responses were needed.

In 1988, Vogel's duties changed when he was assigned to work for a trial team. With that change, Vogel no longer was involved with the settlement evaluation meetings and reports. Instead, he helped prepare specific cases assigned to the team. Vogel did not work on any cases in which the Harrison firm represented the plaintiffs.

During the time Vogel worked on asbestos cases for Brobeck, that firm and two others represented respondents in asbestos litigation filed in Northern California. Brobeck and the other firms were selected for this work by the Asbestos Claims Facility (ACF), a corporation organized by respondents and others to manage the defense of asbestos litigation on their behalf. The ACF dissolved in October 1988, though Brobeck continued to represent most of the respondents through at least the end of the year.[4] Not long after the ACF's dissolution, Brobeck gave Vogel two weeks' notice of his termination, though his termination date was later extended to the end of November.

Vogel contacted a number of firms about employment, and learned that the Harrison firm was looking for paralegals. The Harrison firm recently had opened a Northern California office and filed a number of asbestos cases

---

[4]The exceptions were Eagle-Picher Industries, Inc., which withdrew from the ACF and retained other counsel in February 1988, and Celotex Corporation and Carey Canada, Inc., which were represented by Bjork, Fleer, Lawrence & Harris (Bjork) beginning in December 1988.

against respondents. Sometime in the second half of November 1988, Vogel called Harrison to ask him for a job with his firm.

In that first telephone conversation, Harrison learned that Vogel had worked for Brobeck on asbestos litigation settlements. Harrison testified that he did not then offer Vogel a job for two reasons. First, Harrison did not think he would need a new paralegal until February or March of 1989. Second, Harrison was concerned about the appearance of a conflict of interest in his firm's hiring a paralegal from Brobeck. Harrison discussed the conflict problem with other attorneys, and told Vogel that he could be hired only if Vogel got a waiver from the senior asbestos litigation partner at Brobeck.

Vogel testified that he spoke with Stephen Snyder, the Brobeck partner in charge of managing the Northern California asbestos litigation. Vogel claimed he told Snyder of the possible job with the Harrison firm, and that Snyder later told him the clients had approved and that Snyder would provide a written waiver if Vogel wanted. In his testimony, Snyder firmly denied having any such conversations or giving Vogel any conflicts waiver to work for Harrison. The trial court resolved this credibility dispute in favor of Snyder.

While waiting for a job with the Harrison firm, Vogel went to work for Bjork, which represented two of the respondents in asbestos litigation in Northern California. Vogel worked for Bjork during December 1988, organizing boxes of materials transferred from Brobeck to Bjork. While there, Vogel again called Harrison to press him for a job. Vogel told Harrison that Brobeck had approved his working for Harrison, and Harrison offered Vogel a job starting after the holidays. During their conversations, Harrison told Vogel the job involved work on complex, nonasbestos civil matters, and later would involve processing release documents and checks for asbestos litigation settlements. Harrison did not contact Brobeck to confirm Vogel's claim that he made a full disclosure and obtained Brobeck's consent. Nor did Harrison tell Vogel that he needed a waiver from Bjork.

Vogel informed Bjork he was quitting to work for the Harrison firm. Vogel told a partner at Bjork that he wanted experience in areas other than asbestos litigation, and that he would work on securities and real estate development litigation at the Harrison firm. Initially, Vogel's work for the Harrison firm was confined to those two areas.

However, at the end of February 1989, Vogel was asked to finish another paralegal's job of contacting asbestos plaintiffs to complete client questionnaires. The questionnaire answers provided information for discovery re-

quests by the defendants. Vogel contacted Bjork and others to request copies of discovery materials for the Harrison firm. Vogel also assisted when the Harrison firm's asbestos trial teams needed extra help.

In March 1989, Snyder learned from a Brobeck trial attorney that Vogel was involved in asbestos litigation. In a March 31 letter, Snyder asked Harrison if Vogel's duties included asbestos litigation. Harrison responded to Snyder by letter on April 6. In the letter, Harrison stated Vogel told Snyder his work for the Harrison firm would include periodic work on asbestos cases, and that Harrison assumed there was no conflict of interest. Harrison also asked Snyder to provide details of the basis for any claimed conflict. There were no other communications between Brobeck and the Harrison firm concerning Vogel before the disqualification motion was filed.

In June, a Harrison firm attorney asked Vogel to call respondent Fibreboard Corporation to see if it would accept service of a subpoena for its corporate minutes. Vogel called the company and spoke to a person he knew from working for Brobeck. Vogel asked who should be served with the subpoena in place of the company's retired general counsel. Vogel's call prompted renewed concern among respondents' counsel over Vogel's involvement with asbestos litigation for a plaintiffs' firm. On July 31, counsel for three respondents demanded that the Harrison firm disqualify itself from cases against those respondents. Three days later, the motion to disqualify the Harrison firm was filed; it was subsequently joined by all respondents.

The trial court held a total of 21 hearing sessions on the motion, including 16 sessions of testimony.[5] During the hearing, several witnesses testified that Vogel liked to talk, and the record indicates that he would volunteer information in an effort to be helpful.

A critical incident involving Vogel's activities at Brobeck first came to light during the hearing. Brobeck's computer system access log showed that on November 17, 1988, Vogel accessed the computer records for 20 cases

[5]We note that a motion to disqualify normally should be decided on the basis of the declarations and documents submitted by the parties. An evidentiary hearing should be held only when the court cannot with confidence decide the issue on the written submissions. Such instances should be rare, as when an important evidentiary gap in the written record must be filled, or a critical question of credibility can be resolved only through live testimony. (See *Dewey* v. *R.J. Reynolds Tobacco Co.* (1988) 109 N.J. 201 [536 A.2d 243, 253].) Of course, whether to conduct an evidentiary hearing is a matter left to the discretion of the trial court. In light of the broad scope of the disqualification order respondents sought, the sharp conflicts in the testimony, and the unique and difficult issues presented, we cannot criticize the trial court's diligence in conducting such an extensive hearing and providing such a thorough record.

filed by the Harrison firm. On the witness stand, Vogel at first flatly denied having looked at these case records, but when confronted with the access log, he admitted reviewing the records "to see what kind of cases [the Harrison firm] had filed." At the time, Vogel had no responsibilities for any Harrison firm cases at Brobeck. The date Vogel reviewed those computer records was very close to the time Vogel and Harrison first spoke. The access log documented that Vogel opened each record long enough to view and print copies of all the information on the case in the computer system.

The case information on the computer included the SEAR form data. Many of the 20 cases had been entered on the computer just over a week earlier, though others had been on the computer for weeks or months. The initial computer entries for a case consisted of information taken from the complaint by paralegals trained as part of Brobeck's case intake team. Vogel denied recalling what information for the Harrison firm's cases he saw on the computer, and Brobeck's witness could not tell what specific information was on the computer that day.

Vogel, Harrison, and the other two witnesses from the Harrison firm denied that Vogel ever disclosed any client confidences obtained while he worked for Brobeck. However, Harrison never instructed Vogel not to discuss any confidential information obtained at Brobeck. Vogel did discuss with Harrison firm attorneys his impressions of several Brobeck attorneys. After the disqualification motion was filed, Harrison and his office manager debriefed Vogel, not to obtain any confidences but to discuss his duties at Brobeck in detail and to assess respondents' factual allegations. During the course of the hearing, the Harrison firm terminated Vogel on August 25, 1989.

The trial court found that Vogel's work for Brobeck and the Harrison firm was substantially related, and that there was no express or implied waiver by Brobeck or its clients. The court believed there was a substantial likelihood that the Harrison firm's hiring of Vogel, without first building "an ethical wall" or having a waiver, would affect the outcome in asbestos cases. The court also found that Vogel obtained confidential information when he accessed Brobeck's computer records on the Harrison firm's cases, and that there was a reasonable probability Vogel used that information or disclosed it to other members of the Harrison firm's staff. The court refused to extend the disqualification beyond those cases where there was tangible evidence of interference by Vogel, stating that on the rest of the cases it would require the court to speculate.

The trial court initially disqualified the Harrison firm in all 20 cases Vogel accessed on November 17, 1988, which included 11 cases pending in Contra

Costa County. However, on further consideration, the trial court restricted its disqualification order to the nine cases pending in San Francisco. The Harrison firm timely noticed an appeal from the disqualification order, and respondents cross-appealed from the denial of disqualification in the Contra Costa County cases and all asbestos litigation.

## DISCUSSION

### The Standard of Review

■ A trial court's authority to disqualify an attorney derives from the power inherent in every court, "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." (Code Civ. Proc., § 128, subd. (a)(5); *People* ex rel. *Clancy* v. *Superior Court* (1985) 39 Cal.3d 740, 745 [218 Cal.Rptr. 24, 705 P.2d 347]; *Comden* v. *Superior Court* (1978) 20 Cal.3d 906, 916, fn. 4 [145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R.4th 562]; *Gregori* v. *Bank of America* (1989) 207 Cal.App.3d 291, 299-300 [254 Cal.Rptr. 853].)

■ On review of an order granting or denying a disqualification motion, we defer to the trial court's decision, absent an abuse of discretion. (*Western Continental Operating Co.* v. *Natural Gas Corp.* (1989) 212 Cal.App.3d 752, 758 [261 Cal.Rptr. 100]; *Bell* v. *20th Century Ins. Co.* (1989) 212 Cal.App.3d 194, 198 [260 Cal.Rptr. 459]; *Klein* v. *Superior Court* (1988) 198 Cal.App.3d 894, 908 [244 Cal.Rptr. 226].) The trial court's exercise of this discretion is limited by the applicable legal principles and is subject to reversal when there is no reasonable basis for the action. (*Bell, supra,* at p. 198; *Mills Land & Water Co.* v. *Golden West Refining Co.* (1986) 186 Cal.App.3d 116, 126 [230 Cal.Rptr. 461].)

■ Respondents contend their cross-appeal raises only questions of law entitled to de novo review because they do not challenge the trial court's findings. We disagree. Even when there are no factual findings, if substantial evidence supports the trial court's implied findings of fact, an appellate court reviews the conclusions based on the findings for abuse of discretion. (*Higdon* v. *Superior Court* (1991) 227 Cal.App.3d 1667, 1671 [278 Cal.Rptr. 588].) The same is true when the trial court has taken the extra step of stating the factual reasons for its disqualification order. In any event, the importance of disqualification motions requires careful review of the trial court's exercise of discretion. (*River West, Inc.* v. *Nickel* (1987) 188 Cal.App.3d 1297, 1302 [234 Cal.Rptr. 33].)

## Concerns Raised by Disqualification Motions

Our courts recognize that a motion to disqualify a party's counsel implicates several important interests. These concerns are magnified when, as here, disqualification is sought not just for a single case but for many and, indeed, an entire class of litigation. ■ When faced with disqualifying an attorney for an alleged conflict of interest, courts have considered such interests as the clients' right to counsel of their choice, an attorney's interest in representing a client, the financial burden on the client of replacing disqualified counsel, and any tactical abuse underlying the disqualification proceeding. (*Bell* v. *20th Century Ins. Co., supra,* 212 Cal.App.3d at pp. 197-198; *Gregori* v. *Bank of America, supra,* 207 Cal.App.3d at pp. 300-301; *William H. Raley Co.* v. *Superior Court* (1983) 149 Cal.App.3d 1042, 1048 [197 Cal.Rptr. 232]; but see *River West, Inc.* v. *Nickel, supra,* 188 Cal.App.3d at pp. 1304-1308.)

An additional concern arises if disqualification rules based on exposure to confidential information are applied broadly and mechanically. In the era of large, multioffice law firms and increased attention to the business aspects of the practice of law, we must consider the ability of attorneys and their employees to change employment for personal reasons or from necessity. To paraphrase Lord Chancellor Eldon's statement in *Bricheno* v. *Thorp* (1821) Jacob 300, 302 [37 Eng. Reprint 864, 865], as quoted in *Kraus* v. *Davis* (1970) 6 Cal.App.3d 484, 492 [85 Cal.Rptr. 846]: persons going into business for themselves must not carry into it the secrets of their employers; but on the other hand, we think it our duty to take care that they not be prevented from engaging in any business they may obtain fairly and honorably.

Accordingly, judicial scrutiny of disqualification orders is necessary to prevent literalism from possibly overcoming substantial justice to the parties. (*Comden* v. *Superior Court, supra,* 20 Cal.3d at p. 915.) However, as the Supreme Court recognized in *Comden,* the issue ultimately involves a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility. The paramount concern, though, must be the preservation of public trust in the scrupulous administration of justice and the integrity of the bar. The recognized and important right to counsel of one's choosing must yield to considerations of ethics that run to the very integrity of our judicial process. (*Ibid.*)

## Confidentiality and the Attorney-Client Relationship

Preserving confidentiality of communications between attorney and client is fundamental to our legal system. ■ The attorney-client privilege is a

hallmark of Anglo-American jurisprudence that furthers the public policy of insuring " 'the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense.' [Citation.]" (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 591, 599 [208 Cal.Rptr. 886, 691 P.2d 642].) One of the basic duties of an attorney is "[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." (Bus. & Prof. Code, § 6068, subd. (e).) To protect the confidentiality of the attorney-client relationship, the California Rules of Professional Conduct bar an attorney from accepting "employment adverse to a client or former client where, by reason of the representation of the client or former client, the [attorney] has obtained confidential information material to the employment except with the informed written consent of the client or former client." (Rules Prof. Conduct, rule 3-310(D); *Western Continental Operating Co.* v. *Natural Gas Corp.*, *supra*, 212 Cal.App.3d at p. 759.)

For these reasons, an attorney will be disqualified from representing a client against a former client when there is a substantial relationship between the two representations. (*Western Continental Operating Co.* v. *Natural Gas Corp.*, *supra*, 212 Cal.App.3d at pp. 759-760; *River West, Inc.* v. *Nickel*, *supra*, 188 Cal.App.3d at pp. 1303-1304.) When a substantial relationship exists, the courts presume the attorney possesses confidential information of the former client material to the present representation. (*Ibid.*)

### Confidentiality and the Nonlawyer Employee

The courts have discussed extensively the remedies for the ethical problems created by attorneys changing their employment from a law firm representing one party in litigation to a firm representing an adverse party. Considerably less attention has been given to the problems posed by non-lawyer employees of law firms who do the same. The issue this appeal presents is one of first impression for California courts. While several Courts of Appeal have considered factual situations raising many of the same concerns, as will be discussed below, the decisions in those cases hinged on factors not present here. In short, this case is yet another square peg that does not fit the round holes of attorney disqualification rules. (See, e.g., *Gregori* v. *Bank of America*, *supra*, 207 Cal.App.3d at p. 301; *William H. Raley Co.* v. *Superior Court*, *supra*, 149 Cal.App.3d at pp. 1049-1050, fn. 3.)

Our statutes and public policy recognize the importance of protecting the confidentiality of the attorney-client relationship. (E.g., Bus. & Prof. Code, § 6068, subd. (e); Evid. Code, §§ 915, 917, 951, 952, 954; *Mitchell* v.

*Superior Court, supra*, 37 Cal.3d at pp. 599-600.) The obligation to maintain the client's confidences traditionally and properly has been placed on the attorney representing the client. But nonlawyer employees must handle confidential client information if legal services are to be efficient and cost-effective. Although a law firm has the ability to supervise its employees and assure that they protect client confidences, that ability and assurance are tenuous when the nonlawyer leaves the firm's employment. If the nonlawyer finds employment with opposing counsel, there is a heightened risk that confidences of the former employer's clients will be compromised, whether from base motives, an excess of zeal, or simple inadvertence.

Under such circumstances, the attorney who traditionally has been responsible for protecting the client's confidences—the former employer—has no effective means of doing so. The public policy of protecting the confidentiality of attorney-client communications must depend upon the attorney or law firm that hires an opposing counsel's employee. Certain requirements must be imposed on attorneys who hire their opposing counsel's employees to assure that attorney-client confidences are protected.

### Limits on Protecting Confidentiality

■ We emphasize that our analysis does not mean that there is or should be any broad duty owed by an attorney to an opposing party to maintain that party's confidences in the absence of a prior attorney-client relationship. The imposition of such a duty would be antithetical to our adversary system and would interfere with the attorney's relationship with his or her own clients. The courts have recognized repeatedly that attorneys owe no duty of care to adversaries in litigation or to those with whom their clients deal at arm's length. (See *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 344 [134 Cal.Rptr. 375, 556 P.2d 737]; *Wasmann v. Seidenberg* (1988) 202 Cal.App.3d 752, 755 [248 Cal.Rptr. 744]; *Schick v. Lerner* (1987) 193 Cal.App.3d 1321, 1330-1331 [238 Cal.Rptr. 902]; *St. Paul Title Co. v. Meier* (1986) 181 Cal.App.3d 948, 951 [226 Cal.Rptr. 538]; *Morales v. Field, DeGoff, Huppert & MacGowan* (1979) 99 Cal.App.3d 307, 318 [160 Cal.Rptr. 239].) Instead, we deal here with a prophylactic rule necessary to protect the confidentiality of the attorney-client relationship and the integrity of the judicial system, and with the appropriate scope of the remedy supporting such a rule.

The Harrison firm argues that conflict of interest disqualification rules governing attorneys should not apply to the acts of nonlawyers, citing *Maruman Integrated Circuits, Inc. v. Consortium Co.* (1985) 166 Cal.App.3d 443 [212 Cal.Rptr. 497] and *Cooke v. Superior Court* (1978) 83 Cal.App.3d 582 [147 Cal.Rptr. 915]. The courts in both cases refused to disqualify

attorneys who possessed an adverse party's confidences when no attorney-client relationship ever existed between the party and the attorney sought to be disqualified.

*Maruman* involved a suit by a corporation against its former president and the acts of the corporate secretary's assistant who left the corporation's employment to work for the former president. While still with the corporation, the assistant dealt with the corporation's litigation attorneys and obtained copies of two letters between the attorneys and the corporation. After leaving the corporation, the assistant gave her new employer's attorneys the two letters and shared with them her discussions with the corporation's attorneys. The Court of Appeal found that the trial court did not abuse its discretion in denying the corporation's motion to disqualify the former president's attorneys. (*Maruman Integrated Circuits, Inc.* v. *Consortium Co.*, *supra*, 166 Cal.App.3d at p. 451.)

The court noted that the rule against attorneys using client confidences in representing an adverse party can lead to disqualification, but not when an attorney-client relationship never existed between the party and the attorneys sought to be disqualified. (166 Cal.App.3d at pp. 447-449.) The court relied heavily on the reasoning of *Cooke* v. *Superior Court, supra,* 83 Cal.App.3d 582, in declining to adopt a rule that an attorney's exposure to confidential and privileged information requires, as a matter of law, the attorney's disqualification. (*Maruman, supra,* 166 Cal.App.3d at p. 448.) As in *Cooke,* the *Maruman* court found no basis for extending disqualification to situations where confidential information is transmitted to an attorney by a third party outside the attorney-client relationship. (*Maruman, supra,* at pp. 447-451; *Cooke, supra,* at pp. 590-592.)

We believe the *Maruman* court's conclusions are appropriate for the factual situation that case presented.[6] Mere exposure to the confidences of an adversary does not, standing alone, warrant disqualification. Protecting the integrity of judicial proceedings does not require so draconian a rule. Such a rule would nullify a party's right to representation by chosen counsel any time inadvertence or devious design put an adversary's confidences in an attorney's mailbox. Nonetheless, we consider the means and sources of breaches of attorney-client confidentiality to be important considerations.

In *Maruman,* the adversary's confidences came to the attorney through an employee of the client, the former assistant to the adversary's corporate

---

[6]An additional factor affected the decision in *Maruman.* The Court of Appeal held that the trial court, in denying disqualification, properly considered the possibility that the motion was brought as a tactical device to delay trial. (*Maruman Integrated Circuits, Inc.* v. *Consortium Co., supra,* 166 Cal.App.3d at p. 451.)

secretary. There can be no question that the information the assistant possessed was attorney-client privileged. (See Evid. Code, §§ 952, 954.) However, the information was disclosed to the attorney, in effect, by the attorney's own client. Since the purpose of confidentiality is to promote full and open discussions between attorney and client (*Mitchell* v. *Superior Court, supra,* 37 Cal.3d at p. 599), it would be ironic to protect confidentiality by effectively barring from such discussions an adversary's confidences known to the client. A lay client should not be expected to make such distinctions in what can and cannot be told to the attorney at the risk of losing the attorney's services.[7]

Similarly, in *Cooke,* the client in a dissolution proceeding gave her attorney copies of eight attorney-client privileged documents belonging to her husband. The source of the documents was the husband's butler, who eavesdropped on the husband's discussions with his attorneys and surreptitiously copied the documents and mailed them to the wife. The Court of Appeal upheld an order requiring the wife's attorneys to surrender the copies, but also affirmed that the attorneys need not be disqualified. (*Cooke* v. *Superior Court, supra,* 83 Cal.App.3d at pp. 589, 592.) In summarizing the precedents, the court stated that "it is confidences acquired in the course of an attorney-client relationship which are protected by preventing the recipient of those confidences from representing an adverse party." (*Id.,* at p. 591.) The court found no case imposing disqualification solely as a punitive or disciplinary measure, and there was no prior relationship between the com-

---

[7]For this reason, we question part of the rationale of *Williams* v. *Trans World Airlines, Inc.* (W.D.Mo. 1984) 588 F.Supp. 1037, a case relied on by respondents. In *Williams,* the defendant's personnel manager assisted its attorneys in several age discrimination cases, including the plaintiffs' cases. After the defendant put the manager on involuntary furlough, she retained the plaintiffs' attorneys to pursue her discrimination claim, bringing with her substantial information about defendant's policies and procedures. Although the manager denied any specific recollection of plaintiffs' cases, or possessing any confidential documents, the court nevertheless disqualified the plaintiffs' attorneys in order to avoid the appearance of impropriety. (*Id.,* at pp. 1040, 1043, 1046.)

Avoiding the appearance of impropriety has never been used by a California court as the sole basis for disqualification. (*Gregori* v. *Bank of America, supra,* 207 Cal.App.3d at pp. 306-308; see also *People* v. *Lopez* (1984) 155 Cal.App.3d 813, 823 [202 Cal.Rptr. 333] ["The appearance of impropriety, however, is a malleable factor having the chameleon-like quality of reflecting the subjective views of the percipient. [Citations.]"].) But the court in *Williams* actually grounded its decision on a more concrete test: whether there is a reasonable possibility that some specifically identifiable impropriety occurred that threatens the integrity of the trial process. (*Williams* v. *Trans World Airlines, Inc., supra,* 588 F.Supp. at pp. 1042, 1045.) This standard is not inimical to our approach in this case. Nevertheless, we would be reluctant to conclude that free exchange of information between attorney and client constitutes an impropriety threatening the integrity of the judicial process, at least when a nonattorney client is involved. (Compare *Bell* v. *20th Century Ins. Co., supra,* 212 Cal.App.3d at p. 198, with *Hull* v. *Celanese Corporation* (2d Cir. 1975) 513 F.2d 568 [staff attorney for corporation sought to intervene as a plaintiff in discrimination suit against corporation, resulting in plaintiffs' counsel being disqualified].)

plaining party and the attorneys sought to be disqualified. (*Id.*, at p. 592.) Significantly, though, the court concluded that "[o]ur function is to protect Mr. Cooke from improper use of any privileged data . . . ," and that was done by ordering the wife's attorneys to give up the documents. (*Ibid.*)

The salient fact that distinguishes the present appeal from *Maruman* and *Cooke* is the person who disclosed the adverse party's attorney-client communications. If the disclosure is made by the attorney's own client, disqualification is neither justified nor an effective remedy. A party cannot "improperly" disclose information to its own counsel in the prosecution of its own lawsuit. Even if counsel were disqualified, the party would be free to give new counsel the information, leaving the opposing party with the same situation. (*Bell* v. *20th Century Ins. Co.*, *supra*, 212 Cal.App.3d at p. 198.) However, preservation of open communication between attorney and client is endangered when an attorney's employee discloses client confidences.

### Confidentiality and the Gregori Rule

*Gregori* v. *Bank of America*, *supra*, 207 Cal.App.3d 291, presented circumstances more nearly analogous to this case. An attorney for the plaintiffs initiated a social relationship with a secretary administering the case for an opposing law firm. The attorney admitted discussing with the secretary certain aspects of the case, primarily the personalities of the lawyers involved. The Court of Appeal recognized that the Rules of Professional Conduct did not explicitly proscribe the attorney's conduct. The court also acknowledged that the rules and statutes governing attorneys and privileged information "cannot be applied to the facts of this case without procrustean effort." (*Id.*, at p. 302.) Nor was the court inclined to rely solely on the appearance of impropriety standard because that standard lacks precision. (*Id.*, at pp. 307-308.)

The *Gregori* court distilled the case law and legal literature to produce a new rule for such situations. "Since the purpose of a disqualification order must be prophylactic, not punitive, the significant question is whether there exists a genuine likelihood that the status or misconduct of the attorney in question will affect the outcome of the proceedings before the court. Thus, disqualification is proper where, as a result of a prior representation or through improper means, there is a reasonable probability counsel has obtained information the court believes would likely be used advantageously against an adverse party during the course of the litigation." (*Gregori* v. *Bank of America*, *supra*, 207 Cal.App.3d at pp. 308-309.)

We cannot entirely agree with the rule formulated in *Gregori*. First, as Justice Benson noted in his separate opinion, the rule focuses attention on

the end result of the challenged conduct without including the paramount concern of preserving public trust in the scrupulous administration of justice and the integrity of judicial proceedings. (*Gregori* v. *Bank of America, supra,* 207 Cal.App.3d at p. 314 (conc. and dis. opn. of Benson, J.).) Second, the rule requires the trial judge to predict the effect on the proceedings of information likely to be unknown to the court. ■ Although requiring some showing of the general nature of the information and its relationship to the proceeding can be proper (*Elliott* v. *McFarland Unified School Dist.* (1985) 165 Cal.App.3d 562, 572 [211 Cal.Rptr. 802]), requiring disclosure of the information itself is not (*Woods* v. *Superior Court* (1983) 149 Cal.App.3d 931, 934 [197 Cal.Rptr. 185]). Third, the rule's emphasis on attorney "misconduct" and use of "improper means" distracts from the prophylactic purpose of disqualification. (*Gregori, supra,* at pp. 308-309.)

Thus, the rule in *Gregori* does not address the situation in this case, where the integrity of judicial proceedings was threatened not by attorney misconduct, but by employee misconduct neither sanctioned nor sought by the attorney. The Harrison firm's disqualification is required not because of an attorney's affirmative misconduct, but because errors of omission and insensitivity to ethical dictates allowed the employee's misconduct to taint the firm with a violation of attorney-client confidentiality.

### Protecting Confidentiality—The Cone of Silence

■ Hiring a former employee of an opposing counsel is not, in and of itself, sufficient to warrant disqualification of an attorney or law firm. However, when the former employee possesses confidential attorney-client information,[8] materially related to pending litigation, the situation implicates " '. . . considerations of ethics which run to the very integrity of our judicial process.' [Citation.]" (*Comden* v. *Superior Court, supra,* 20 Cal.3d at p. 915, fn. omitted.) Under such circumstances, the hiring attorney must

---

[8]We specifically mean the phrase, "confidential attorney-client information," to correspond to the definition of " 'confidential communication between client and lawyer' " contained in Evidence Code section 952: "information transmitted between a client and his [or her] lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship." The definition encompasses an attorney's legal opinions, impressions, and conclusions, regardless of whether they have been communicated to the client. (*Benge* v. *Superior Court* (1982) 131 Cal.App.3d 336, 345 [182 Cal.Rptr. 275]; see Cal. Law Revision Com. com., 29B West's Ann. Evid. Code, § 952 (1991 pocket supp.) p. 74 [Deering's Ann. Evid. Code (1986) § 952, p. 112].)

obtain the informed written consent of the former employer,[9] thereby dispelling any basis for disqualification. (Cf. Rules Prof. Conduct, rule 3-310(D); see Civ. Code, § 3515 ("[One] who consents to an act is not wronged by it.") Failing that, the hiring attorney is subject to disqualification unless the attorney can rebut a presumption that the confidential attorney-client information has been used or disclosed in the new employment.

A law firm that hires a nonlawyer who possesses an adversary's confidences creates a situation, similar to hiring an adversary's attorney, which suggests that confidential information is at risk. We adapt our approach, then, from cases that discuss whether an entire firm is subject to vicarious disqualification because one attorney changed sides. (See, e.g., *Klein* v. *Superior Court, supra,* 198 Cal.App.3d at pp. 908-914; *Chambers* v. *Superior Court* (1981) 121 Cal.App.3d 893 [175 Cal.Rptr. 575].) The courts disagree on whether vicarious disqualification should be automatic in attorney conflict of interest cases, or whether a presumption of shared confidences should be rebuttable. (See *Klein, supra,* at pp. 910-913.) An inflexible presumption of shared confidences would not be appropriate for nonlawyers, though, whatever its merits when applied to attorneys. There are obvious differences between lawyers and their nonlawyer employees in training, responsibilities, and acquisition and use of confidential information. These differences satisfy us that a rebuttable presumption of shared confidences provides a just balance between protecting confidentiality and the right to chosen counsel.

The most likely means of rebutting the presumption is to implement a procedure, before the employee is hired, which effectively screens the employee from any involvement with the litigation, a procedure one court aptly described as a " 'cone of silence.' " (See *Nemours Foundation* v. *Gilbane, Aetna, Federal Ins.* (D.Del. 1986) 632 F.Supp. 418, 428.) Whether a potential employee will require a cone of silence should be determined as a matter of routine during the hiring process. It is reasonable to ask potential

---

[9]Rule 2-100 of the Rules of Professional Conduct would preclude the hiring attorney from seeking the consent directly from the opposing party. Thus, the consent should be sought from the former employer. The hiring attorney ought to be entitled to rely on a written consent from the former employer. If the opposing party contends the former employer was not authorized to give consent, that is a matter between the former employer and its client.

The hiring attorney, and not the prospective employee, must obtain the consent. The prospective employee is unlikely both to know enough about the new job and to have the legal ethics training necessary to obtain informed consent. Also, an individual under economic pressure to get the new job could be tempted to give less attention to candor and honesty than to securing employment. Harrison should not have delegated this sensitive task to a nonlawyer job seeker. Harrison's reliance on Vogel's word alone for the claimed waiver by Brobeck was unreasonable and a serious lapse in judgment.

employees about the nature of their prior legal work; prudence alone would dictate such inquiries. Here, Harrison's first conversation with Vogel revealed a potential problem—Vogel's work for Brobeck on asbestos litigation settlements.

The leading treatise on legal malpractice also discusses screening procedures and case law. (1 Mallen & Smith, Legal Malpractice (3d ed. 1989) §§ 13.18-13.19, pp. 792-797.) We find several points to be persuasive when adapted to the context of employee conflicts. "Screening is a prophylactic, affirmative measure to avoid both the reality and appearance of impropriety. It is *a* means, but not *the* means, of rebutting the presumption of shared confidences." (*Id.*, § 13.19, at p. 794, original italics, fn. omitted.) Two objectives must be achieved. First, screening should be implemented before undertaking the challenged representation or hiring the tainted individual. Screening must take place at the outset to prevent any confidences from being disclosed. Second, the tainted individual should be precluded from any involvement in or communication about the challenged representation. To avoid inadvertent disclosures and to establish an evidentiary record, a memorandum should be circulated warning the legal staff to isolate the individual from communications on the matter and to prevent access to the relevant files. (*Id.*, at pp. 795-796.)[10]

The need for such a rule is manifest. We agree with the observations made by the *Williams* court: "[Nonlawyer] personnel are widely used by lawyers to assist in rendering legal services. Paralegals, investigators, and secretaries must have ready access to client confidences in order to assist their attorney employers. If information provided by a client in confidence to an attorney for the purpose of obtaining legal advice could be used against the client because a member of the attorney's [nonlawyer] support staff left the attorney's employment, it would have a devastating effect both on the free flow of information between client and attorney and on the cost and quality of the legal services rendered by an attorney." (*Williams* v. *Trans World Airlines, Inc.*, *supra*, 588 F.Supp. at p. 1044.) Further, no regulatory or ethical rules, comparable to those governing attorneys, restrain all of the many types of nonlawyer employees of attorneys. The restraint on such employees' disclosing confidential attorney-client information must be the employing attorney's admonishment against revealing the information.[11]

---

[10]A further recommendation by the authors is worth noting. To detect conflicts created by employee hiring, a firm's conflict checking system should include the identity of adverse counsel to enable a search for those matters where the prospective employee's former employer is or was adverse. (1 Mallen & Smith, Legal Malpractice, *supra*, § 13.18, at pp. 793-794.)

[11]We surmise that a practical, if limited, check on the problem may exist. Attorneys are unlikely to hire those who disregard preserving confidences; such persons are as likely to betray new entrustments as old.

## *The Substantial Relationship Test and Nonlawyer Employees*

We decline to adopt the broader rule urged by respondents and applied by other courts,[12] which treats the nonlawyer employee as an attorney and requires disqualification upon the showing and standards applicable to individual attorneys. Respondents argue that disqualification must follow a showing of a "substantial relationship" between the matters worked on by the nonlawyer at the former and present employers' firms. However, the substantial relationship test is a tool devised for presuming an attorney possesses confidential information material to a representation adverse to a former client. (*Western Continental Operating Co. v. Natural Gas Corp.*, *supra*, 212 Cal.App.3d at pp. 759-760.) The presumption is a rule of necessity because the former client cannot know what confidential information the former attorney acquired and carried into the new adverse representation. (*Ibid.*) The reasons for the presumption, and therefore the test, are not applicable though, when a nonlawyer employee leaves and the attorney remains available to the client. The client and the attorney are then in the best position to know what confidential attorney-client information was available to the former employee.

Respondents' alternative formulation, that a substantial relationship between the type of work done for the former and present employers requires disqualification, presents unnecessary barriers to employment mobility. Such a rule sweeps more widely than needed to protect client confidences. We share the concerns expressed by the American Bar Association's Standing Committee on Ethics and Professional Responsibility: "It is important that nonlawyer employees have as much mobility in employment opportunity as possible consistent with the protection of clients' interests. To so limit employment opportunities that some nonlawyers trained to work with law firms might be required to leave the careers for which they are trained would disserve clients as well as the legal profession. Accordingly, any restrictions on the nonlawyer's employment should be held to the minimum necessary to protect confidentiality of client information." (Imputed Disqualification

---

[12]See, e.g., *Kapco Mfg. Co., Inc. v. C & O Enterprises, Inc.* (N.D.Ill. 1985) 637 F.Supp. 1231, 1236-1237 (applying to nonlawyer employee the Seventh Circuit's analysis for disqualification of attorney who changes sides); *Williams v. Trans World Airlines, Inc.*, *supra*, 588 F.Supp. at page 1044 ("The only practical way to assure that [confidences will not be disclosed] and to preserve public trust in the scrupulous administration of justice is to subject these 'agents' of lawyers to the same disability lawyers have when they leave legal employment with confidential information."); *Glover Bottled Gas Corp. v. Circle M. Beverage Barn, Inc.* (1987) 129 A.D.2d 678 [514 N.Y.S.2d 440]; *Lackow v. Walter E. Heller & Co. Southeast* (Fla.Dist.Ct.App. 1985) 466 So.2d 1120, 1123; but see *Esquire Care, Inc. v. Maguire* (Fla.Dist.Ct.App. 1988) 532 So.2d 740, 741 (imposing additional step of evidentiary hearing to determine if ethical violation has resulted in one party's obtaining "an unfair advantage over the other which can only be alleviated by removal of the attorney. [Citations.]").

Arising from Change in Employment by Nonlawyer Employee, ABA Standing Com. on Ethics & Prof. Responsibility, Informal Opn. No. 88-1526 (1988) p. 3.) Respondents' suggested rule could easily result in nonlawyer employees becoming "Typhoid Marys," unemployable by firms practicing in specialized areas of the law where the employees are most skilled and experienced.

### Protecting Confidentiality—The Rule for Disqualification

■ Absent written consent, the proper rule and its application for disqualification based on nonlawyer employee conflicts of interest should be as follows. The party seeking disqualification must show that its present or past attorney's former employee possesses confidential attorney-client information materially related to the proceedings before the court.[13] The party should not be required to disclose the actual information contended to be confidential. However, the court should be provided with the nature of the information and its material relationship to the proceeding. (See *Elliott* v. *McFarland Unified School Dist.*, *supra*, 165 Cal.App.3d at p. 572.)

Once this showing has been made, a rebuttable presumption arises that the information has been used or disclosed in the current employment. The presumption is a rule by necessity because the party seeking disqualification will be at a loss to prove what is known by the adversary's attorneys and legal staff. (Cf. *Western Continental Operating Co.* v. *Natural Gas Corp.*, *supra*, 212 Cal.App.3d at pp. 759-760.) To rebut the presumption, the challenged attorney has the burden of showing that the practical effect of formal screening has been achieved. The showing must satisfy the trial court that the employee has not had and will not have any involvement with the litigation, or any communication with attorneys or coemployees concerning the litigation, that would support a reasonable inference that the information has been used or disclosed. If the challenged attorney fails to make this showing, then the court may disqualify the attorney and law firm.

### The Trial Court Properly Exercised Its Discretion

■ With the foregoing principles in mind, we turn to the trial court's exercise of discretion. The Harrison firm devotes a substantial portion of its arguments to challenging the sufficiency of the evidence to support disqual-

---

[13]The evidence showing the former employee's possession of such information need not be as dramatic as Vogel's confession in this case. Possession of the information can be shown, for example, by competent evidence of the former employee's job responsibilities or participation in privileged communications. We caution, however, that showing merely potential access to confidences without actual exposure is insufficient. The threat to confidentiality must be real, not hypothetical.

ification. However, the factual arguments advanced by the Harrison firm do not take appropriate account of the applicable standard of review. ██ On review, we must accept the trial court's resolution of conflicting evidence and uphold the trial court's ruling if it is supported by substantial evidence. (*Higdon v. Superior Court, supra,* 227 Cal.App.3d at p. 1671; *Klein v. Superior Court, supra,* 198 Cal.App.3d at p. 913.) Under the familiar rules, we must consider the evidence in the light most favorable to the prevailing party and take into account every reasonable inference supporting the trial court's decision. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289.)

██ The Harrison firm's primary contention on appeal is that respondents failed to show that Vogel possessed any specific client confidences. The Harrison firm's repeated invocation of *specific* confidences misses the point and underscores the futility of its factual argument. Vogel admitted reviewing the Harrison firm's cases on Brobeck's computer to see "what kind of cases [the Harrison firm] had filed." The plain inference is that Vogel used his training in asbestos litigation to make a rough analysis of his prospective employer's cases. Vogel acknowledged that because of his experience in looking at SEAR forms, he knew that some cases have more value than others. He also testified that the SEAR forms are used as the basis for evaluating cases. The SEAR form information Vogel obtained about the Harrison firm's cases was part of a system of attorney-client communications.

There can be no question that Vogel obtained confidential attorney-client information when he accessed the Harrison firm's case files on Brobeck's computer. Respondents need not show the specific confidences Vogel obtained; such a showing would serve only to exacerbate the damage to the confidentiality of the attorney-client relationship. As discussed above, respondents had to show only the nature of the information and its material relationship to the present proceedings. They have done so.

To blunt the impact of Vogel's misconduct, the Harrison firm argues that the cases on the computer were newly filed and that no evidence showed the computer information to be more than appeared on the face of the complaints, which are public records. The argument is wrong on both points. While many of the cases were entered on the computer little more than a week earlier, others were entered weeks or months before Vogel looked at them. Moreover, the fact that some of the same information may appear in the public domain does not affect the privileged status of the information when it is distilled for an attorney-client communication. (*Mitchell v. Superior Court, supra,* 37 Cal.3d at p. 600; *In re Jordan* (1974) 12 Cal.3d 575, 580 [116 Cal.Rptr. 371, 526 P.2d 523].) Therefore, there was substantial

evidence that Vogel possessed confidential attorney-client information materially related to the cases for which the trial court ordered disqualification.[14]

The Harrison firm also argues that there was no evidence that Vogel disclosed any confidences to any member of the firm, or that any such information was sought from or volunteered by Vogel. Harrison testified that he never asked Vogel to divulge anything other than impressions about three Brobeck attorneys. Harrison and his office manager also testified that Vogel was not involved in case evaluation or trial tactics discussions at the Harrison firm. However, this evidence is not sufficient to rebut the presumption that Vogel used the confidential material or disclosed it to staff members at the Harrison firm. Moreover, there was substantial evidence to support a reasonable inference that Vogel used or disclosed the confidential information.

Despite Harrison's own concern over an appearance of impropriety, Harrison never told Vogel not to discuss the information Vogel learned at Brobeck and did not consider screening Vogel even after Brobeck first inquired about Vogel's work on asbestos cases. The evidence also amply supports the trial court's observation that Vogel was "a very talkative person, a person who loves to share information." Further, Vogel's willingness to use information acquired at Brobeck, and the Harrison firm's insensitivity to ethical considerations, were demonstrated when Vogel was told to call respondent Fibreboard Corporation and Vogel knew the person to contact there.[15]

The trial court did not apply a presumption of disclosure, which would have been appropriate under the rule we have set forth. The evidence offered by the Harrison firm is manifestly insufficient to rebut the presumption.

---

[14]We think it important to mention a point not briefed by the parties, though our decision does not turn on it. When Vogel used his computer access, training, and experience at Brobeck to review the information on the Harrison firm's cases, he necessarily formed some impressions, conclusions, and opinions about those cases. It seems to us that such opinions, formed while a Brobeck employee, would constitute confidential attorney-client information belonging to Brobeck. If a Brobeck attorney had directed Vogel to use SEAR form data to prepare a memorandum on "what kind of cases" the Harrison firm filed, no one would dispute that the Harrison firm could not properly obtain that memorandum without Brobeck's consent. We perceive no reason for a different conclusion when such opinions are not recorded and are the result of unauthorized conduct by the employee.

[15]We do not address whether this direct contact with a party represented by counsel violated the Rules of Professional Conduct, rule 2-100. We agree with the Harrison firm's contention that this contact would not itself support the trial court's disqualification order. (See *Chronometrics, Inc.* v. *Sysgen, Inc.* (1980) 110 Cal.App.3d 597, 603, 607 [168 Cal.Rptr. 196] [former Rules Prof. Conduct, rule 7-103].) However, the trial court did not base disqualification on that contact. We consider the contact to be probative of the likelihood that Vogel used or disclosed confidential information during his employment by the Harrison firm.

Beyond that, though, substantial evidence established a reasonable probability that Vogel used or disclosed to the Harrison firm the confidential attorney-client information obtained from Brobeck's computer records. Accordingly, the trial court was well within a sound exercise of discretion in ordering the Harrison firm's disqualification.

### Equitable Considerations for Disqualification Motions

■■■■ The Harrison firm argues that equitable considerations preclude disqualification, contending that respondents unreasonably delayed moving for disqualification and that prejudice to the Harrison firm's clients resulted. The evidence shows that by March 1989 Brobeck knew Vogel was working for Harrison and that his work included asbestos litigation. There also was evidence that Vogel himself was dealing with respondents' law firms during June and July of 1989. In the same time period, Brobeck learned of Vogel's call to Fibreboard Corporation. But respondents did not file their disqualification motion until August 3, 1989, the eve of trial in a significant asbestos case. The Harrison firm also alludes to other possible tactical advantages respondents sought in the timing of their motion.

■■■■ This court addressed the standard applicable to this issue in *Western Continental Operating Co.* v. *Natural Gas Corp.*, *supra*, 212 Cal.App.3d at pages 763-764. There we stated: "In exercising its discretion with respect to granting or denying a disqualification motion, a trial court may properly consider the possibility that the party brought the motion as a tactical device to delay litigation. [Citations.] Where the party opposing the motion can demonstrate prima facie evidence of unreasonable delay in bringing the motion causing prejudice to the present client, disqualification should not be ordered. The burden then shifts back to the party seeking disqualification to justify the delay. [Citation.] Delay will not necessarily result in the denial of a disqualification motion; the delay and the ensuing prejudice must be extreme. [Citation.]" (*Ibid.*) Even if tactical advantages attend the motion or disqualification, that alone does not justify denying an otherwise meritorious motion.

■■■■ We are disturbed by respondents' delay in bringing the motion, and that the motion was timed to coincide with the start of a significant asbestos case. However, the Harrison firm failed to show that the delay caused any prejudice, much less extreme prejudice. The evidence does not show that resolution of the asbestos case set for trial was substantially delayed. The only prejudice cited by the Harrison firm is that their clients lost the services of knowledgeable counsel of their choice, and were forced to retain new counsel. This is not the type of prejudice contemplated by our decision in *Western Continental Operating Co.* v. *Natural Gas Corp.*, *supra*,

212 Cal.App.3d at pages 763-764. (See *River West, Inc.* v. *Nickel, supra,* 188 Cal.App.3d at p. 1313.) Rather, the Harrison firm has simply identified those client interests implicated by any disqualification motion. (See, e.g., *Bell* v. *20th Century Ins. Co., supra,* 212 Cal.App.3d at pp. 197-198.) We find no abuse of discretion by the trial court on this issue.

### *Jurisdictional Limits on the Power to Disqualify Counsel*

■ On their cross-appeal, respondents contend the trial court erred by not extending the disqualification order to the 11 Harrison firm cases pending in Contra Costa County that Vogel reviewed on Brobeck's computer. Respondents also exhort us to extend the disqualification order to preclude the Harrison firm from representing any asbestos litigation plaintiffs.

Noting that superior courts are courts of general jurisdiction, respondents analogize the situation to one where the court has personal jurisdiction over a party. Respondents argue that if the court may enjoin a party's conduct anywhere in the state, then it also must have the power to enjoin an attorney from participation in cases anywhere in the state. Such a rule is necessary, respondents contend, to avoid a multiplicity of disqualification motions and the risk of inconsistent or contrary outcomes. Respondents urge such a rule as the only meaningful way to protect their confidential information. While respondents' arguments have a superficial appeal to the interests of judicial economy, neither the law nor necessity warrants adopting respondents' position.

The power to disqualify an attorney, as we stated above, derives from the court's inherent power to control the conduct of persons "in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." (Code Civ. Proc., § 128, subd. (a)(5); *Comden* v. *Superior Court, supra,* 20 Cal.3d at p. 916, fn. 4.) This does not mean that a superior court has any inherent or statutory power to control the conduct of persons in judicial proceedings pending before a different superior court. One court may not interfere with the process of another court of equal jurisdiction in a case properly before the latter. (*Steiner* v. *Flournoy* (1972) 23 Cal.App.3d 1051, 1055-1056 [100 Cal.Rptr. 680]; see *Williams* v. *Superior Court* (1939) 14 Cal.2d 656, 662 [96 P.2d 334]; *Ford* v. *Superior Court* (1986) 188 Cal.App.3d 737, 741-742 [233 Cal.Rptr. 607].) Respondents' desire to disqualify the Harrison firm from an entire class of litigation, and to do so economically in one hearing, does not enable one court to disqualify counsel of record in actions over which another court has jurisdiction. A court may not usurp the discretion vested in another court to control the conduct of counsel in its judicial proceedings. This is a matter of fundamental comity between the courts, which should not be cast aside because it may be expedient under the novel circumstances of this case.

On a motion to disqualify counsel, the circumstances of each case should be examined. (See *Mills Land & Water Co. v. Golden West Refining Co.*, *supra*, 186 Cal.App.3d at p. 133; *William H. Raley Co. v. Superior Court*, *supra*, 149 Cal.App.3d at p. 1049.) This rule is not expendable simply because a party seeks disqualification for many cases in one motion, even if the cases bear as many similarities as are commonly found in asbestos litigation. The test still must be whether the former employee of counsel for the party seeking disqualification possessed information materially related to each case.[16] In any event, whether the Harrison firm should be disqualified in any cases pending in other superior courts is a question we leave for those courts to decide in the sound exercise of their discretion in light of our opinion. Because each case must be evaluated on its own, there need be no concern about inconsistent or contrary outcomes. Disqualification is either warranted or not on a case-by-case basis.

### Disqualification in All Asbestos Litigation Is Unwarranted

Finally, we consider whether the trial court abused its discretion in not ordering the Harrison firm disqualified from all asbestos litigation before the court. Respondents argue that disqualification should have been extended to all asbestos cases because all are substantially related, or because Vogel's work at Brobeck and the Harrison firm was substantially related—arguments we have considered and rejected. Respondents point to evidence that Vogel was exposed to their counsels' theories, strategies, and tactics, including assessments of witnesses and settlement values assigned to different types of asbestos cases, as requiring total disqualification. We disagree.

The trial court was satisfied that for the Harrison firm cases Vogel accessed on the computer, there was a reasonable probability that Vogel acquired confidential information that he disclosed or used at the Harrison firm. As to other cases, the court felt it was simply speculative. The record does not show that Vogel possessed and disclosed confidential attorney-client information materially related to all of the Harrison firm's asbestos litigation. On the evidence before the trial court, we cannot say that the court's decision was an abuse of discretion. Indeed, when considered under

---

[16]In this regard, the evidence may warrant a court's consideration of whether the passage of time has affected the materiality of the confidential information. (Cf. *Johnson v. Superior Court* (1984) 159 Cal.App.3d 573, 579 [205 Cal.Rptr. 605].) As respondents' own witnesses recognized was true for asbestos litigation, each case is different for many reasons; different clients have different concerns, and those concerns change from time to time.

the standard applicable to our review, the evidence supports a conclusion that a broader disqualification would be unwarranted.

Vogel stopped attending settlement evaluation meetings in mid-1988. These were the principal source of the confidential information to which Vogel was exposed. Vogel did not begin to work for the Harrison firm until January 1989. Initially, Vogel's work and work area were separate and isolated from the Harrison firm's asbestos cases. Vogel first started work on asbestos cases in late February or early March and certainly ceased by the time he was terminated in August. His work for the Harrison firm on asbestos cases apparently was limited and sporadic. Vogel did not participate in any of the Harrison firm's asbestos litigation evaluation and strategy meetings. At the Harrison firm, Vogel processed settlement releases and checks, inventoried and obtained generalized discovery materials, and completed plaintiff questionnaires. These were not the types of duties that required Vogel to use or disclose the broader categories of information respondents contend are confidential.

Undoubtedly, some of the information known by Vogel lost any materiality to the Harrison firm's cases through the passage of time. (Cf. *Johnson* v. *Superior Court, supra,* 159 Cal.App.3d at p. 579.) The evidence showed that even litigation as subject to routine as asbestos cases nevertheless evolves over time. Moreover, the Harrison firm presented substantial evidence showing that Vogel's use or disclosure of confidential information was not so pervasive as to require disqualification from all asbestos litigation. This conclusion is bolstered by the fact that Vogel's termination removed any threat of further disclosures to the Harrison firm.

We have considered the remaining contentions raised by the parties and, in view of the determinations reached above, those contentions do not require further discussion.

## CONCLUSION

We realize the serious consequences of disqualifying attorneys and depriving clients of representation by their chosen counsel. However, we must balance the important right to counsel of one's choice against the competing fundamental interest in preserving confidences of the attorney-client relationship. All attorneys share certain basic obligations of professional conduct, obligations that are essential to the integrity and function of our legal system. Attorneys must respect the confidentiality of attorney-client information and recognize that protecting confidentiality is an imperative to be obeyed in both form and substance. A requisite corollary to these principles is that attorneys must prohibit their employees from violating confidences of

former employers as well as confidences of present clients. Until the Legislature or the State Bar chooses to disseminate a different standard, attorneys must be held accountable for their employees' conduct, particularly when that conduct poses a clear threat to attorney-client confidentiality and the integrity of our judicial process.

The order of the trial court is affirmed. Each party shall bear its own costs.

White, P. J., and Strankman, J., concurred.

The petition of plaintiffs and appellants and objectors and appellants for review by the Supreme Court was denied October 3, 1991.